**Thomas J. DONAGHY, Appellant,**

v.

**CITY OF OMAHA, A Municipal Corporation, Appellee.**

**James Skinner, Chief of Police and P.J. Morgan, Mayor of Omaha.**

No. 90–1780.

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 12, 1990.

Decided May 24, 1991.

Rehearing and Rehearing En Banc Denied Aug. 7, 1991.

---

Donald Earnshaw, Omaha, Neb., for appellant.

Thomas Mumgaard, Omaha, Neb., for appellee.

Before LAY, Chief Judge, and HEANEY and FRIEDMAN *, Senior Circuit Judges.

---

* The Honorable Daniel M. Friedman, United States Senior Circuit Judge for the Federal Cir-

HEANEY, Senior Circuit Judge.

Thomas Donaghy, a sergeant with the Omaha Police Department (OPD), brought this section 1983 action against the City of Omaha, its mayor, and its chief of police. Donaghy, who is white, sought a promotion to lieutenant, but he was neither interviewed for nor promoted to the position. He claimed that the City discriminated against him by interviewing and promoting a black applicant, Anthony Hadley, who had more seniority but scored lower than Donaghy on tests the City used to rank job applicants. The City contended that it promoted Hadley to comply with a constitutionally valid, remedial consent decree. The district court agreed with the City and granted the City's motion for a directed verdict, setting aside a jury verdict that had awarded Donaghy $3,753 in damages. We affirm.

## I.

## BACKGROUND

### A. *The 1980 Consent Decree*

In 1979, an organization of black police officers, the Brotherhood of Midwest Guardians (Guardians), filed suit against the City of Omaha, its mayor, and its police chief. The Guardians sought injunctive relief and damages. They alleged, among other things, that the OPD had engaged in discriminatory hiring and promotion practices: (1) by using qualification tests that had a disparate impact on blacks, even though the tests had not been shown to be job-related or predictive of job performance; (2) by promoting white officers instead of more qualified black officers; (3) by limiting black officers' work assignments; (4) by refusing to recruit and hire blacks on an equal basis with whites; (5) by using other subjective hiring and promotion procedures that discriminated against black applicants and black officers; and (6) by refusing to allow black officers the same specialized training opportunities available to white officers. In an amended com-

cuit, sitting by designation.

plaint, the Guardians alleged that although the OPD had used funds from the Law Enforcement Assistance Administration (LEAA) in a discriminatory manner, the LEAA had continued to fund the OPD, in violation of 42 U.S.C. § 3766.

Senior Judge Richard E. Robinson permitted two white officers who had ranked number one and two in competitive examinations for sergeant positions to intervene and contest the propriety of a temporary restraining order and preliminary injunction. Donaghy's union did not ask to intervene. The court subsequently denied the Guardians' motion for a temporary restraining order and the Guardians' motion for a preliminary injunction.

The City responded to the Guardians' complaint with a general denial. Discovery proceeded. In the summer of 1980, the United States Department of Justice indicated to the City that it had an interest in the case. In July 1980, the City told the court that the United States Department of Justice and the City were in the process of negotiating a consent decree regarding the OPD's employment practices. The City asked the court to grant it more time to respond to the Guardians' requests for additional discovery, and suggested that a consent decree between the United States and the City might "have a favorable impact" on the Midwest Guardians case. The court granted the City's request.

After at least three months of negotiations between the United States and the City, the United States filed a proposed consent decree with the court. At the same time, the United States filed an independent action against the City, its personnel director, and its chief of police. The United States alleged that the City, through its police department, had violated nondiscrimination provisions of 31 U.S.C. § 1242 and 42 U.S.C. § 3789d(c)(3). Specifically, the United States alleged that the City discriminated against blacks: (1) by not recruiting, hiring, assigning, and pro-

moting blacks on the same basis as whites; (2) by using examinations and other qualification standards that had a disparate impact on blacks but which had not been properly validated as predictive of job performance; and (3) by not taking affirmative action to correct the effect of past discriminatory practices. The United States alleged that as of October 1980, only 4.3% of the OPD's 560 sworn personnel were black; that of the 170 officers hired since 1972 only 4 officers, or 2.4% were black; and that of the 42 police officers hired in 1978, none were black.[1] The United States sought injunctive relief prohibiting the OPD from continuing discriminatory practices and from refusing to take remedial measures.

The City did not file an answer to the United States' complaint. Instead, on October 23, 1980, Senior Judge Robinson consolidated the United States' case with the Midwest Guardians' case and entered a consent decree order in settlement of both cases. The intervenors neither signed nor objected to the consent decree.

The decree's stated purpose was to ensure that blacks were not disadvantaged by any of the OPD's past practices and policies, and to remedy these problems. Accordingly, paragraph 8 of the decree provided for, among other things, both interim and long-term goals:

> Subject to the availability of qualified applicants, the City of Omaha will achieve a long term goal of hiring sufficient numbers of black sworn officers onto the OPD to result in an overall work force consisting of 9.5 percent black officers within seven years of the entry of this decree. In order to meet this long term goal, the City adopts the interim goals set out below for use on an annual basis in filling vacancies in sworn OPD positions.
>
> (a) For the sworn entry position of police officer, the interim goal shall be to

---

1. The City's employment manager, Michael Mendenhall, corroborated these statistics at trial. He testified that when the consent decree was entered: (1) there were less than four percent blacks in the OPD; (2) that that percentage reflected a substantial imbalance compared to the population measured against; and (3) that the underutilization of blacks was prevalent in all ranks of the department.

fill at least forty percent (40%) of all vacancies with qualified black applicants until such time as black officers constitute six percent (6%) of the overall sworn work force of the OPD. Thereafter, the interim goal shall be to fill at least one-third (33⅓%) of all vacancies with qualified black applicants until such time as black officers constitute eight percent (8%) of the overall sworn work force of the OPD. Thereafter, the interim goal shall be to fill at least twenty-five percent (25%) of all vacancies with qualified black applicants until the long term goal is achieved.

It is recognized that the City of Omaha has made substantial efforts to recruit black applicants for the sworn entry level position of police officer. The City shall maintain an active and continuing program of recruitment directed at increasing the number of black applicants for entry level positions to a level consistent with achieving this interim goal. The City shall solicit the suggestions of the Brotherhood of Midwest Guardians as to the most effective methods and techniques to be utilized in such a recruitment program.

(b) For promotional sworn positions in the OPD, the interim goal shall be to appoint qualified blacks in at least the proportion that these groups are represented in the classes of employees eligible for promotion.

Thus, the consent decree required the City to increase the number of black officers in its 560–member force from approximately 24 to 53 over seven years.

About five years later, the United States and the Guardians claimed the City was not following the decree. They sought a preliminary injunction that would bar the OPD from hiring entry-level police officers based on written tests the City had administered. In a thorough memorandum opinion, then-District Judge C. Arlen Beam granted the injunction in part, ruling that the City's written tests had an adverse impact on black applicants and were not validated within the meaning of the Uniform Guidelines contained in 28 C.F.R. § 50.14.[2] The court noted that the City's witness admitted that the tests had never been formally validated, and the court concluded that the City had not shown a relationship between an applicant's admission tests score and the applicant's job performance. The court enjoined the City from using the challenged written tests until those tests were validated. It further ordered the infusion of black candidates into the pool of entry level candidates to be interviewed. The court also urged the City to develop new testing and selection procedures consistent with the Uniform Guidelines, but acknowledged that the "Consent Decree does not require validation" and that "the City may use any selection process it chooses, provided that such process does not have an adverse impact upon black applicants."

B. *Donaghy's Case*

Donaghy, who had entered the OPD in 1977, became a sergeant in 1983. The City posted a notice for lieutenant positions in 1987; the notice set forth the three-phase examination process that would determine the promotion eligibility list.[3] An appli-

**2.** Likewise, nothing in this record demonstrates that the 1987 tests for the lieutenant positions were validated within the meaning of the Uniform Guidelines contained in 28 C.F.R. § 50.14.

**3.** The first phase was open to all applicants. It included a multiple choice examination that tested knowledge of both OPD operating procedures and the agreement between the Police Union and the City. Applicants would also be awarded additional credit for college achievement and service with the OPD. Thirty-five applicants would then be invited to participate in the second phase, which included a written examination called the "In–Basket." Because

there were only thirty-four applicants, all went on to the second phase. The In–Basket examination, which presented applicants with situations they might encounter as a lieutenant, was supposed to measure administrative skills. The City then combined the scores from the first and second phases, ranked the applicants by score, and invited twenty applicants to the "Assessment Center," an oral examination which constituted the third phase of the selection process. The City invited the applicants ranked one through fifteen, the applicant ranked number twenty (a black), and the next four highest ranking blacks and women. The applicants ranked sixteen through nineteen were not invit-

cant's performance during the examination process was important to an applicant's rank on the final promotion eligibility list, but not dispositive. The notice also stated that weight would be given to an applicant's experience and education, and that some applicants would be "referred based on the City's current Affirmative Action Plan."

Donaghy met the experience and training requirements for the lieutenant position and applied for the job. Based on his examination results, along with his credits for police service and college achievement, Donaghy ranked number seven on the final eligibility list, which was to last for two years.

Three lieutenant positions opened in April 1988. At this time only 3.2% of the lieutenants were black, while 10.7% of those eligible to be promoted to lieutenant were black. The City was thus below the interim goal set forth in paragraph 8(b) of the consent decree. The personnel director sent the police chief a personnel requisition form that contained six names for the three positions which opened in April 1988.[4] City officials testified that to comply with the consent decree, they could not submit the top six names from the list, as there were no black candidates among the applicants ranked one through six. Instead, the personnel director submitted the top five names and the applicant ranked number thirteen, Anthony Hadley, who was the top-ranking black on the final list. Hadley,

like Donaghy, fully met the qualifications the OPD set for the lieutenant position.

The police chief could pick any three applicants from the list of six submitted, and he chose the applicants ranked one and two (Steve Coufal, a white male, and Gary Becerra, an Hispanic male), and Hadley. The mayor concurred with the police chief's recommendation and promoted Coufal, Becerra, and Hadley. The mayor testified he promoted Hadley because Hadley was qualified for the job, and because "it might have also helped meet the requirements of the agreement that was reached [in the consent decree]."[5] The remaining three applicants from the short list of six were returned to the promotion eligibility list. This left Donaghy ranked number five among remaining candidates.

Another opening developed in August 1988. Pursuant to the City ordinance, the personnel director sent the police chief a personnel requisition form with three names (Davitt, Cavanaugh, and Farmer) on it. The city promoted the candidate ranked number three (a white male) and returned the other two candidates to the list (including a black candidate). This left Donaghy ranked number four among the remaining candidates on the promotion eligibility list.

Finally, one more vacancy appeared in July 1989. Pursuant to a new City ordinance, the personnel director referred the top three names on the list (Cavanaugh, Hauptman, and Tostenson), plus an affirmative action candidate (Farmer). Because the personnel director did not refer Dona-

---

ed to participate in the Assessment Center. After the Assessment Center, the City made its final ranking of twenty by combining the scores from the three examinations and adding points for service with the police department and college achievement.

**4.** A City ordinance in effect at the time provided that if one position was to be filled, the personnel director was to submit to the department head (here, the police chief) the "three highest names on the appropriate list." If more than one position was to be filled, as was the case in April 1988, the personnel director was to submit twice as many eligible candidates as there were vacancies. The City ordinance also provided that the candidates "be certified in strict order of standing on the list except in cases where the personnel director has determined there is good

reason for certification of eligibles with special qualifications."

A reminder attached to the requisition form containing the six names stated:

REMINDER REGARDING
ATTACHED CANDIDATES

Attached is a P–20 which lists candidates for the vacant position(s) in your department. There is an underutilization in the EEO category in which this position is grouped. The underutilization applies to:

X Minorities
X Females
NOTE: IN ORDER TO COMPLY WITH THE CONSENT DECREE, A BLACK CANDIDATE MUST BE SELECTED.

**5.** Before Hadley's promotion, only 1 of the OPD's 31 lieutenants was black.

ghy to the police chief, Donaghy was not considered for this position. The candidate ranked number five, a white female, was promoted, while the other three, including Farmer, were returned to the list.

Donaghy then filed a section 1983 suit against the City of Omaha, the mayor, and the police chief.[6] Donaghy alleged that the police department did not promote whites on a basis equal with blacks, ignored rank order for promotion, and promoted a black person to lieutenant even though Donaghy was more qualified than the black applicant. Donaghy did not challenge the validity of the consent decree in his complaint. He did not claim that the consent decree was entered into for something other than a remedial purpose or that the consent decree was not narrowly tailored to achieve its purpose.

The City asserted as a defense in its answer that it acted in accordance with the 1980 consent decree. In addition, the City claimed that Donaghy's complaint was an "impermissible collateral attack" upon the consent decree. After the defendants had filed their answer, however, the Supreme Court disapproved of the impermissible collateral attack doctrine in *Martin v. Wilks*, 490 U.S. 755, 109 S.Ct. 2180, 104 L.Ed.2d 835 (1989). Accordingly, the case remained on the trial calendar, and Donaghy had the opportunity to prove that the consent decree was not remedial or was not narrowly tailored to its claimed remedial purpose. The case was tried before a jury.

The City moved for a directed verdict at the close of the plaintiff's evidence. The court denied the motion, although it had a "very grave doubt" that Donaghy had made out a prima facie case. At the close of the City's case and after Donaghy's rebuttal, the City renewed its motion for a directed verdict. The court reserved ruling and sent the case to the jury, which found for two of the defendants (the mayor and the police chief),[7] but against the City of

Omaha. The jury awarded Donaghy $3,753 in damages.

The court received the verdict but ordered entry of judgment withheld pending ruling upon the City's motion for a directed verdict. Donaghy later asked the court to enter judgment on his behalf, but the court instead scheduled a hearing on the City's directed verdict motion on which it had reserved ruling. After the hearing, the court granted the City's motion for a directed verdict. The court stated:

> Donaghy has presented no competent evidence that any City of Omaha official or employee acted toward him with discriminatory intent *or with reckless disregard of his rights*. He presented evidence that the City had tested and evaluated candidates with regard to a number of factors, including race. However, when viewed in the light most favorable to the plaintiff, and in the context of an uncontrovertedly valid, judicially-imposed consent decree, the evidence presented shows, at most, that the City was merely complying with a consent decree that required the City to consider race, among other attributes, in evaluating candidates for promotion to lieutenant.
>
> Donaghy relies upon *Martin v. Wilks* ... for the proposition that the existence of a consent decree cannot be used to validate race-conscious employment decisions....
>
> That reliance is misplaced. In *Wilks* the issue was whether the existence of a consent decree barred any challenge to race-conscious employment decisions purportedly based upon that decree, on the grounds that such a challenge constituted an "impermissible collateral attack on the consent decree[]".... Holding that dismissal on such grounds was improper, the United States Supreme Court affirmed the Eleventh Circuit's remand of the case for trial on reverse discrimination claims....
>
> In contrast, Donaghy has had his day in court; he was provided the opportuni-

---

**6.** Donaghy also filed claims under 42 U.S.C. § 1981. The district court dismissed these claims before it submitted the case to the jury, and Donaghy does not appeal that decision.

**7.** Donaghy does not contest the jury's verdict in favor of the mayor and the police chief.

ty to [contest] employment-related decisions made in the context of a consent decree.

## II.

## DISCUSSION

### A. *Standing*

■ Donaghy claims that he was injured due to the City's race-conscious employment decisions. He contends that if the City had ignored race and strictly followed rank order in the referral and promotion process, he would have had the opportunity to interview for the lieutenant position. Because federal courts are under an independent obligation to examine their own jurisdiction, *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, ——, 110 S.Ct. 596, 607, 107 L.Ed.2d 603, 621 (1990), we address whether Donaghy has standing to bring this claim.

If applicants had been referred to the police chief in strict rank order pursuant to ordinance, only the six top-ranking candidates would have been referred for the three openings that appeared in April 1988. Neither Donaghy nor Hadley would have been referred to the police chief for consideration and neither of them could have been promoted to lieutenant. Three of the top six candidates would have been promoted, three would have been returned to the list, leaving Donaghy now fourth in line among remaining candidates:[8]

| List Rank | Decision |
|---|---|
| 1 | promoted |
| 2 | promoted |
| 3 | promoted |
| 4 | returned to list |
| 5 | returned to list |
| 6 | returned to list |
| 7 (Donaghy) | |

If rank order had been followed again in August 1988, the next three candidates on the list would have been referred for consideration. One of the three would have

been promoted and the other two would have returned to the list, leaving Donaghy now third in line among the remaining candidates on the list:

| List Rank | Decision |
|---|---|
| 4 | promoted |
| 5 | returned to list |
| 6 | returned to list |
| 7 (Donaghy) | |

Donaghy would lack standing to bring this case if the list had expired at this point. As the foregoing shows, Donaghy could not have been considered for the April and August 1988 lieutenant positions even if rank order had been strictly followed, so the City's decision to interview and promote Hadley could not have caused him a "distinct and palpable injury." *See Warth v. Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975).

The list, however, did not expire, and another opening appeared in July 1989. Had rank order been followed then, the personnel director would have referred Donaghy for the July 1989 opening, along with three other candidates:

*List rank of candidates who would have been considered for July 1989 opening had rank order been strictly followed*

5

6

7 (Donaghy)

13 (affirmative action candidate referred pursuant to new City ordinance)

There is no guarantee that Donaghy would have been promoted to the July 1989 position. One of Donaghy's claims, however, was that the City denied Donaghy the opportunity to compete for the July 1989 promotion by not strictly following rank order in the referral process *and* by promoting Hadley in the first round. We find he has standing to raise that claim.

■ We note, however, that Donaghy lacks standing to complain about the City's decisions to interview Hadley for the April

---

**8.** For purposes of illustration, we assume that the top applicant or applicants would have been hired. Under the City ordinance, the police chief and the mayor were free to hire any of the candidates referred to them. They did not have to hire based on rank order.

1988 position and to interview Farmer for the August 1988 and July 1989 positions. If Hadley, or any other candidate who scored lower than Donaghy, had been interviewed but not promoted in April and August 1988, Donaghy would have been able to interview for the July 1989 position, and would have suffered no injury.[9]

We mention this because it affects the issues we consider on this appeal. Although the City had a general affirmative action plan, that plan did not dictate the employment decision that Donaghy has standing to challenge (Hadley's promotion). The uncontroverted evidence at trial showed that the City's decision to promote Hadley was due to its belief that the consent decree required it to take this action. The affirmative action plan was not relevant to that decision, and Donaghy conceded as much in his closing remarks to the jury. We thus do not discuss the City's general affirmative action plan here.

### B. *Martin v. Wilks*

 Before 1989, most circuits had held that plaintiffs such as Donaghy could not challenge race-conscious employment decisions made pursuant to a consent decree, even if the plaintiffs were not parties to the consent decree. *See Martin v. Wilks*, 490 U.S. at 762 n. 3, 109 S.Ct. at 2185 n. 3, 104 L.Ed.2d at 845 n. 3 (listing cases). These circuits had held that by failing to timely intervene in the initial proceeding, a party was foreclosed from later challenging actions taken under the consent decree, because such a challenge would constitute an impermissible collateral attack on the consent decree. *Id.* 490 U.S. at 761–63, 109 S.Ct. at 2184–85, 104 L.Ed.2d at 844–45.

The Supreme Court, however, rejected the impermissible collateral attack doctrine in *Martin v. Wilks.* In that case, a group of white Birmingham fire fighters claimed that promotion decisions made in reliance on consent decrees violated the Constitution and Title VII. The City admitted to making race-conscious employment decisions, but argued that the decisions were unassailable because they were made pursuant to the consent decree. The district court granted the City's motion to dismiss, but the Eleventh Circuit reversed, and the Supreme Court affirmed. *Wilks,* 490 U.S. at 758–62, 109 S.Ct. at 2182–84, 104 L.Ed.2d at 842–44.

In the Court's view, the flaw in the district court's decision was that the "District Court may have been affected by the mistaken view that respondents' claims on the merits were barred to the extent they were inconsistent with the consent decree." *Id.* 490 U.S. at 769, 109 S.Ct. at 2188, 104 L.Ed.2d at 849. The Court held that the fire fighters, who were not parties to the original action which produced the consent decree, could not be barred absolutely from challenging employment decisions made pursuant to the decree. *Id.* 490 U.S. at 761, 109 S.Ct. at 2184, 104 L.Ed.2d at 844 (agreeing with the Eleventh Circuit's view that because white fire fighters were "neither parties nor privies to the consent decrees, ... their independent claims of unlawful discrimination are not precluded"); *id.* 490 U.S. at 767, 109 S.Ct. at 2187, 104 L.Ed.2d at 847–48 ("No one can seriously

---

**9.** If Hadley had not been hired in April 1988, Donaghy would have been left fourth in rank among remaining applicants:

| List Rank | Decision |
|---|---|
| 1 | promoted |
| 2 | promoted |
| 3 | promoted |
| 4 | returned to list |
| 5 | returned to list |
| 6 | |
| 7 (Donaghy) | |
| 13 (Hadley) | returned to list |

If Hadley had not been promoted for the August 1988 position, Donaghy would then be third in rank among remaining applicants:

| List Rank | Decision |
|---|---|
| 4 | promoted |
| 5 | returned to list |
| 6 | |
| 7 (Donaghy) | |
| 13 (Hadley) | returned to list |

This would leave Donaghy eligible to be interviewed for the July 1989 position, because the City would have referred the three top-ranked candidates (which would include Donaghy), along with an affirmative action candidate, presumably Hadley.

contend that an employer might successfully defend against a Title VII claim by one group of employees on the ground that its actions were required by an earlier decree entered in a suit brought against it by another, if the later group did not have adequate notice or knowledge of the earlier suit.").

Donaghy, however, apparently would have us read *Wilks* as nullifying all consent decrees with respect to nonparties. Under Donaghy's reasoning, if an employer is operating under a constitutionally valid consent decree that requires the employer to make race-conscious employment decisions, the employer still could not make race-conscious employment decisions that would in any way affect nonparties to the consent decree. Accordingly, Donaghy claims that *Wilks* mandated the following jury instruction and that the trial judge erred by refusing to submit it to the jury:

Plaintiff claims that the defendants violated Section 1983 of Title 42 of the United States Code thereby depriving him of his constitutional right to equal protection of the law. Defendants have asserted that they relied upon a Consent Decree entered in the case of the Brotherhood of Midwest Guardians v[.] The City of Omaha in making any promotion related race conscious decisions. You are instructed that a person cannot be deprived of his legal rights in a proceeding to which he is not a party. If you find that

the plaintiff was not a party to the Consent Decree the defendants cannot rely upon it as a basis to deprive the plaintiff of his rights and you must find for the plaintiff.

We disagree. In our view, the trial court properly rejected this misleading instruction.

The flaw in Donaghy's proposed instruction is that it equates the right to challenge a consent decree with a general right to be free of race-conscious employment decisions taken pursuant to a consent decree. *Wilks* does not create Donaghy's proposed general right. While *Wilks* permits a nonparty to challenge the validity of employment decisions made pursuant to a consent decree, it does not speak to whether a particular race-conscious employment decision taken pursuant to a consent decree will meet constitutional standards. Donaghy seems to argue that all race-conscious remedies are unconstitutional, notwithstanding the Supreme Court's repeated statements that certain narrowly tailored, remedial, race-conscious employment decisions are permitted under the Constitution.[10] Nothing in *Wilks* disturbs these cases,[11] or other substantive law governing reverse discrimination challenges to consent decrees which require race-conscious affirmative action. *Wilks* simply holds that those who did not participate and were not represented in prior consent decree litigation may have the opportunity to "ask a

10. *See United States v. Paradise*, 480 U.S. 149, 166, 107 S.Ct. 1053, 1063, 94 L.Ed.2d 203 (1987) (plurality); *id.* at 189–90, 107 S.Ct. at 1075–76 (Stevens, J., concurring); *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 280–81, 283–84, 106 S.Ct. 1842, 1850, 1851–52, 90 L.Ed.2d 260 (1986) (plurality) (hiring goals proper means to remedy effects of prior discrimination); *id.* at 286, 106 S.Ct. at 1853 (O'Connor, J., concurring); *Fullilove v. Klutznick*, 448 U.S. 448, 482–83, 100 S.Ct. 2758, 2776–77, 65 L.Ed.2d 902 (1980) (plurality) (minority business set-asides proper); *id.* at 520, 100 S.Ct. at 2796 (Marshall, J., concurring); *cf. City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 498–500, 109 S.Ct. 706, 723–725, 102 L.Ed.2d 854 (1989) (insufficient proof that set-aside program was remedial). The Court has suggested that goals which affect hiring and promotion, as here, are more acceptable than those imposing layoffs. *See United States v. Paradise*, 480 U.S. at 188–89, 107 S.Ct. at 1075–

76 (Powell, J., concurring); *Wygant*, 476 U.S. at 282–84, 106 S.Ct. at 1851–52 (plurality); *id.* at 294–95, 106 S.Ct. at 1857–58 (White, J., concurring).

11. Indeed, the Eleventh Circuit remanded the *Wilks* case for trial on the discrimination claims and suggested that the operative law for judging the contested consent decrees was that governing voluntary affirmative action plans. *In re Birmingham Reverse Discrimination Employment Litig.*, 833 F.2d 1492, 1500–01 (11th Cir. 1987). While the Supreme Court did not expressly approve of this standard when it affirmed the Eleventh Circuit's decision, it did approve of the Eleventh Circuit's decision to remand for a trial on the merits with instructions to the district court that it not consider notions of preclusion or impermissible collateral attack. *Wilks*, 490 U.S. at 769, 109 S.Ct. at 2188, 104 L.Ed.2d at 849.

court to consider their claims that actions taken pursuant to the consent decree are unlawful under the governing statutory and constitutional standards." Selig, *Affirmative Action in Employment after Croson and Martin: The Legacy Remains Intact*, 63 Temple L.Rev. 1, 21 (1990). Here, the district court followed *Wilks* and gave Donaghy precisely the opportunity that *Wilks* requires: the opportunity to prove that the race-conscious measures taken pursuant to the consent decree were invalid because the consent decree (1) did not serve a remedial purpose, or (2) was not tailored narrowly enough. Donaghy was not foreclosed from presenting his case, so we turn to the merits of his reverse discrimination claim.

C. *Standards Governing Reverse Discrimination Claims*

■ The validity of a consent decree's affirmative action plan is a question of law. *See Sisco v. J.S. Alberici Const. Co.*, 655 F.2d 146, 149 (8th Cir.1981), *cert. denied*, 455 U.S. 976, 102 S.Ct. 1485, 71 L.Ed.2d 688 (1982). As with any other section 1983 suit, a plaintiff making a reverse discrimination challenge under section 1983 against an employment decision bears the burden of proving his or her rights were violated. *Wygant*, 476 U.S. at 277–78, 106 S.Ct. at 1848–49 (plurality); *id.* at 292, 106 S.Ct. at 1856 (O'Connor, J., concurring). In a reverse discrimination case, "the satisfaction of the four part *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) test will not necessarily show a prima facie violation" of section 1983 where the evidence demonstrates that the "plaintiff's treatment by the employer was pursuant to a bona fide affirmative action plan." *Warsocki v. City of Omaha*, 726 F.2d 1358, 1360 & n. 3 (8th Cir.1984) (quoting *Setser v. Novack Inv. Co.*, 657 F.2d 962, 968 (8th Cir.1981) (en banc)).

■ To demonstrate that a purportedly remedial affirmative action plan is bona fide, an employer must first show the plan is indeed remedial. Thus, we require an employer to have identified a conspicuous racial imbalance in its work force in order to "ensure that new forms of invidious discrimination are not approved in the guise of remedial affirmative action." *Setser*, 657 F.2d at 968. Second, the employer must show that the plan which seeks to remedy effects of past discrimination is narrowly tailored to meet that goal. *See Wygant*, 476 U.S. at 279–81, 106 S.Ct. at 1849–51 (plurality) (reviewing cases); *cf. Croson*, 488 U.S. at 507, 109 S.Ct. at 728 (majority) (set-aside plan not narrowly tailored). The plaintiff then has the burden to show that some reason other than a remedial one motivated the employer when implementing the plan or that the plan adopted unreasonably exceeds its remedial purpose. *See Warsocki*, 726 F.2d at 1360–61; *see also Wygant*, 476 U.S. at 292–93, 106 S.Ct. at 1856–57 (O'Connor, J., concurring); *Setser*, 657 F.2d at 969 (reverse discrimination claim under § 1981).

■ For example, in the context of a reverse discrimination challenge to a school board's voluntary affirmative action plan, Justice O'Connor observed that

... nonminority teachers could easily demonstrate that the purpose and effect of the plan is to impose a race-based classification. But when the Board introduces its statistical proof as evidence of its remedial purpose, thereby supplying the court with the means for determining that the Board had a firm basis for concluding that remedial action was appropriate, it is incumbent upon the nonminority teachers to prove their case; they continue to bear the ultimate burden of persuading the court that the Board's evidence did not support an inference of prior discrimination and thus a remedial purpose, or that the plan instituted on the basis of this evidence was not sufficiently "narrowly tailored."

*Wygant*, 476 U.S. at 292–93, 106 S.Ct. at 1857 (O'Connor, J., concurring); *see also id.* at 277–78, 106 S.Ct. at 1848–49 (plurality) (trial court must find that employer had strong basis in evidence for its conclusion that remedial action was necessary); *cf. Croson*, 488 U.S. at 510, 109 S.Ct. at 729 (plurality) (in context of legislatively mandated minority business set-asides, City failed to show it had a strong basis in

evidence for its conclusion that remedial action was necessary). Formal findings of past discrimination need not precede a public employer's adoption of a remedial affirmative action plan. *Wygant,* 476 U.S. at 289–92, 106 S.Ct. at 1854–57 (O'Connor, J., concurring) (giving policy reasons); *id.* at 304–05, 312 n. 7, 106 S.Ct. at 1862–63, 1867 n. 7 (Marshall, J., dissenting); *id.* at 313, 106 S.Ct. at 1867 (Stevens, J., dissenting); *see also id.* at 277–78, 106 S.Ct. at 1848–49 (plurality) (public employers need convincing evidence that remedial action is warranted); *cf. Croson,* 488 U.S. at 519, 109 S.Ct. at 734 (Kennedy, J., concurring) (in context of legislatively mandated set-asides, evidence that would support a judicial finding of intentional discrimination may suffice to justify remedial legislative action for it diminishes constitutional responsibility of political branches to say they may not act until ordered to do so by a court).

 In a reverse discrimination case challenging a consent decree's affirmative action plan, the legal standards will be similar but not identical to those used when assessing a public employer's voluntary affirmative action plan. An affirmative action consent decree stands somewhere in between a voluntary affirmative action program (as in *Wygant*) and a remedial plan that a court has imposed after making a formal finding of intentional discrimination (as in *United States v. Paradise,* 480 U.S. 149, 107 S.Ct. 1053, 94 L.Ed.2d 203 (1987)), for a consent decree is a hybrid that has "attributes both of contracts and of judicial decrees." *Local 93, Int'l Ass'n of Firefighters v. City of Cleveland,* 478 U.S. 501, 519, 106 S.Ct. 3063, 3073, 92 L.Ed.2d 405 (1986) (quoting *United States v. ITT Continental Baking Co.,* 420 U.S. 223, 236 n. 10, 95 S.Ct. 926, 934 n. 10, 43 L.Ed.2d 148 (1975)). Unlike a voluntary affirmative action plan, a consent decree is subject to court approval before it can take effect, is often approved only after a fairness hearing, and commonly remains under the court's jurisdiction for a number of years. Because a federal court is not just a "recorder of contracts," but "an organ of government constituted to make judicial de-

cisions," a consent decree must meet three requirements. First, it must "spring from and serve to resolve a dispute within the court's subject matter jurisdiction;" second, it must "come within the general scope of the case made by the pleadings;" and third, it must "further the objectives of the law upon which the complaint was based." *Local 93,* 478 U.S. at 525, 106 S.Ct. at 3077. While the entry of an affirmative action consent decree does not guarantee that the decree serves a remedial purpose or is narrowly tailored, the heightened judicial oversight inherent in a properly entered decree helps attain that end.

 Accordingly, this court has recognized that when an employer is called upon to show a remedial purpose, the employer can meet its burden by producing evidence "that the employer implemented its plan ... in adherence to a court order, whether entered by consent or after litigation." *Setser v. Novack Inv. Co.,* 657 F.2d 962, 968 (8th Cir.1981) (en banc), *cert. denied,* 454 U.S. 1064, 102 S.Ct. 615, 70 L.Ed.2d 601 (1981). As with a voluntary affirmative action plan, an employer subject to a consent decree plan must also demonstrate that the plan was a response to a conspicuous racial imbalance in its work force, and that the plan is sufficiently narrowly tailored to the remedial purpose.

### D. *Donaghy's Reverse Discrimination Claim*

 Donaghy introduced evidence that race was a factor in the City's decision to hire Hadley. The City, however, demonstrated (1) that the decree's purpose was remedial and a response to a racial imbalance, and (2) that the plan was narrowly tailored. Donaghy did not rebut this evidence, and the trial court properly directed a verdict in favor of the City.

The City demonstrated the remedial purpose of the consent decree. It was introduced into evidence, and officials for the City testified that they referred Hadley for the position and promoted him because he was qualified and because they believed his promotion was required by the decree.

This indicates a remedial purpose. *See Setser*, 657 F.2d at 968, 969 (absent rebuttal evidence, remedial purpose shown where the employer implemented its plan in adherence to a court order entered by consent or after litigation).

The City also demonstrated that the plan was a response to a conspicuous racial imbalance in its work force. Testimony established that when the consent decree was entered: (1) there were less than four percent blacks in the OPD; (2) this percentage reflected a substantial imbalance compared to the population measured against; and (3) the underutilization of blacks was prevalent in all ranks of the department. This testimony corroborated the statistics included in the United States' complaint, some of which presented a strong inference of discrimination: of the 42 officers hired in 1978, none were black. *See International Bhd. of Teamsters v. United States*, 431 U.S. 324, 342 n. 23, 97 S.Ct. 1843, 1858 n. 23, 52 L.Ed.2d 396 (1977) (inference of discrimination came from "the inexorable zero").

Moreover, Senior Judge Robinson stated in the jury instructions that before he had entered the consent decree, he had reviewed the consent decree to determine that it was lawful, reasonable, and equitable. He stated that the decree's purpose was to overcome "an apparent imbalance reflecting the underutilization of black persons" in the OPD, that it set goals to meet that end, and that the City could be required to make race-conscious decisions in promotions to meet those goals. This instruction reflected Senior Judge Robinson's experience with the case, as he had presided over much of the consolidated Midwest Guardians actions and had approved the consent decree before he presided over Donaghy's trial.

Donaghy did not present evidence to rebut the City's showing that the plan was remedial and a response to a racial imbalance. He did not challenge the propriety of the procedure that led to the decree. He did not challenge the statistical basis for the decree, and he admitted during closing argument that there had been an underrepresentation of blacks in the OPD when the consent decree was entered. All Donaghy did to contest the decree was to state he was not a party to the original action, and to point to language in the consent decree in which the City disclaimed liability.

Neither of these arguments persuades us that the consent decree was not remedial. Although Donaghy was not a party to the consent decree, his presence was not necessary to ensure the propriety of the decree, and the record fully supports the district court's decision that the consent decree was remedial and was narrowly tailored. While the consent decree contains a formal disclaimer of liability,[12] little weight can be given to disclaimers of this nature, and the City never denied the accuracy of the statistics the United States presented in its complaint. *See Kirkland v. New York State Dep't. of Correctional Servs.*, 711 F.2d 1117, 1131 n. 16 (2d Cir.1983), *cert. denied*, 465 U.S. 1005, 104 S.Ct. 997, 79 L.Ed.2d 230 (1984); *United States v. City of Alexandria*, 614 F.2d 1358, 1365 n. 15 (5th Cir.1980).

The City also demonstrated that the decree's plan was tailored narrowly enough to meet its remedial purpose. It required the City to hire approximately 29 additional qualified blacks over seven years, and it gave the City wide latitude to achieve that goal. Because the consent decree's interim and long-term goals applied only to blacks, the minority group identified as being underutilized, the plan was not overinclusive. *Compare Croson*, 488 U.S. at 506, 109 S.Ct. at 727 (majority) (questioning how a purportedly remedial minority business set-aside could be narrowly tailored where plan included minorities never identified in any way as having suffered from discrimination in the area); *Wygant*, 476 U.S. at 284

---

**12.** Paragraph 4 of the decree provided that:
The City of Omaha expressly denies that it is or has been guilty of any wrong-doing. It is understood that this Decree does not in any manner constitute an admission by the Defendants that they have intentionally or knowingly violated any federal law prohibiting discrimination in employment on the basis of race or color.

n. 13, 106 S.Ct. at 1852 n. 13 (plurality) (voluntary affirmative action plan "undifferentiated" where no apparent reason why certain minority groups were included in preferences). Although the plan set a long-term goal, that goal could be waived because it was "subject to the availability of qualified applicants." The plan did not require the City either to hire the unqualified or to hire unnecessary personnel in order to meet the long-term or interim goals. *See Paradise*, 480 U.S. at 177–78, 107 S.Ct. at 1069–70 (plurality) (remedy flexible because it required qualified applicants and did not require "gratuitous promotions"). Moreover, the interim promotion goal was directly tied to the relevant work force, namely the percentage of qualified blacks eligible for promotion within the OPD. *See Croson*, 488 U.S. at 501–02, 109 S.Ct. at 725 (majority) (discussing relevant labor market in employment context); *see also Paradise*, 480 U.S. at 179, 107 S.Ct. at 1070 (plurality); *id.* at 187, 107 S.Ct. at 1074 (Powell, J., concurring) (when determining whether a remedy is narrowly tailored, a court may examine the relationship between the percentage of minority workers to be employed and the percentage of minority group members in the relevant population or work force). Finally, the consent decree was limited in duration to seven years.

Donaghy's only argument in response to this evidence was that race-conscious goals were inappropriate because the City instead could have made education and training programs available, presumably so that the test scores of blacks would improve. The fact is, however, that the consent decree contained such alternative measures, including training programs.[13] Moreover,

the "tailoring" requirement is to be interpreted both carefully and flexibly, for there is no universal answer to the problem of remedying racial discrimination, and "the choice of remedies to redress racial discrimination is a balancing process left, within appropriate constitutional or statutory limits, to the sound discretion of the trial court." *Paradise*, 480 U.S. at 184, 107 S.Ct. at 1073 (plurality) (quoting *Fullilove*, 448 U.S. at 508, 100 S.Ct. at 2790). The remedial purpose of the consent decree entered by the trial court was to increase the number of *qualified* black officers in the OPD, and the consent decree was a carefully made tool designed to attain that end. *See Paradise*, 480 U.S. at 185, 107 S.Ct. at 1073 (plurality) (setting forth factors that determine whether race-conscious remedies are narrowly tailored).

Given this record, we agree with the district court that the consent decree was "uncontrovertedly valid." Because the City demonstrated that the consent decree plan was remedial and narrowly tailored to that end, and because Donaghy never demonstrated that some reason other than a remedial one motivated the employer when implementing the plan or that the plan adopted unreasonably exceeded its remedial purpose, the challenged employment decision made pursuant to the consent decree did not violate Donaghy's constitutional rights.[14] We affirm the judgment of the district court.

---

**13.** Paragraph 13 of the consent decree provided:

In order to ensure that all employees have equal opportunities to improve their performance on the job and to advance in the ranks of the OPD, the City shall provide black sworn employees of the OPD with access to all internal and external training courses equal to that of all other sworn employees.

A description of any training course available to sworn personnel of the OPD shall be prominently posted in areas where it will be visible to all officers at least two weeks prior

to the time when selections for that course are to be made. The description shall inform officers of the requirements for eligibility for the course and shall provide a date by which interested persons must submit applications for the course. Selection of officers to attend training courses shall be made in a non-discriminatory manner from the applications submitted and in accordance with the needs of the OPD.

**14.** We find no merit to Donaghy's contention that the consent decree did not require the City

---

to promote Hadley. There is no question that Hadley was a qualified black eligible for the promotion and that when he applied for the promotion, the percentage of black lieutenants on the force was far less than the percentage of black sergeants eligible for promotion. One of the consent decree's interim goals required the City to increase the number of black lieutenants in the OPD by promoting qualified black applicants. The City met this obligation by promoting Hadley. The consent decree plainly gave the City flexibility with respect to meeting the interim and long-term goals—goals which Donaghy did not effectively challenge.

Donaghy also claims that under Fed.R.Civ.P. 50(b), the trial court was without jurisdiction to enter the directed verdict, because it did so more than ten days after the jury returned its verdict and the City had not filed a timely motion for a JNOV. Donaghy, however, relies on the pre–1963 version of Rule 50(b), which required a JNOV motion within ten days after the verdict. The current rule requires a motion within ten days after entry of judgment. Here, the judge withheld entry of judgment pending ruling on the City's motion for a directed verdict, so the City was not required to file any motion within ten days. See Nichols Constr. Co. v. Cessna Aircraft Co., 808 F.2d 340, 354–56 (5th Cir.1985).