SELYA, Circuit Judge.
For over a quarter of a century, the hiring of firefighters in the City of Boston (the City) has taken place in the albedo of a federal court consent decree designed to remedy the effects of past discrimination against African-Americans and Hispanics. On April 11, 2001, five candidates for employment (the Candidates) brought suit in the federal district court alleging that the City had discriminated against them on the basis of race-when hiring new firefighters in the fall of 2000. The City defended its hiring practices as compliant with, and compelled by, the terms of the consent decree. The district court granted summary judgment in the defendants’ favor. See Quinn v. City of Boston, 204 F.Supp.2d 156 (D.Mass.2002). The Candidates appeal. For the reasons that follow, we reverse the judgment and remand to the district court for further proceedings consistent with this opinion.
I. BACKGROUND
In considering an appeal from a grant of summary judgment, this court, like the trial court, normally will “view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party’s favor.” Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir.1990). Here, however, the facts upon which our decision turns are undisputed.
In the early 1970s, two suits were brought against a number of municipalities subject to the Massachusetts Civil Service law (now codified at Mass. Gen. Laws ch. 31, §§ 1-77). The suits alleged that the municipalities engaged in discriminatory recruitment and hiring practices whilst staffing their respective fire departments. These actions culminated in the entry of an omnibus consent decree that influenced the manner in which the affected municipalities could recruit and hire firefighters. Boston Chapter, NAACP, Inc. v. Beecher, 371 F.Supp. 507, 520-23 (D.Mass.1974) (Beecher I). The decree was affirmed on appeal. Boston Chapter, NAACP, Inc. v. Beecher, 504 F.2d 1017, 1028 (1st Cir.1974) *24 (Beecher II), cert. denied, 421 U.S. 910, 95 S.Ct. 1561, 43 L.Ed.2d 775 (1975). It has been in effect for nearly thirty years.
The Beecher decree — courts consistently have used that phrase to include the original decree and subsequent orders entered to fine-tune it, see, e.g., Mackin v. City of Boston, 969 F.2d 1273, 1274 (1st Cir.1992), and we emulate that example — circumscribed the hiring of firefighters in much of Massachusetts over the ensuing years. Its history up to 1992 is well chronicled in the case law. See, e.g., id. at 1274-75. We urge readers who thirst for a more complete understanding of the genesis and operation of the decree to consult that opinion. For present purposes, we are content to note that the Beecher decree was intended to rectify a situation in which many fire departments within Massachusetts had remained lily-white, or nearly so, despite dramatic increases in the African-American and Hispanic populations. The decree sought to accomplish its goal by affirmative action, i.e., by fostering a hiring regime that accorded race-based preferences to blacks and Spanish-surnamed individuals.[1] Id. at 1274 n. 2. Each of the affected fire departments was to remain subject to the strictures of the decree (and, thus, to accord race-based preferences) until such time as that department met a general benchmark established by the decree: the attainment of parity (or, at least, rough parity). See Beecher I, 371 F.Supp. at 523 (providing for release from the decree “[a]s a city or town achieves a complement of minorities commensurate with the percentage of minorities within the community”). The meaning of this criterion, and the manner in which it is to be gauged, are questions that have permeated this litigation from the outset. Not surprisingly, those questions are central to the case at hand.
Unlike some forty-five other fire departments that heretofore have met the goals of the decree and gained release from its constraints, the Boston Fire Department (BFD) has operated under the auspices of the Beecher decree since 1974. A decade ago, a group of non-minority men, aspiring to appointments as firefighters within the BFD, endeavored to bring the City out from under the umbrella of the decree. See Mackin, 969 F.2d at 1275. Although we affirmed the district court’s rejection of that attempt, we noted that the decree was not meant to operate in perpetuity. To the contrary, it would remain in force as to any particular municipality only until its stated goal had been achieved. Id. at 1278. A decade has passed, but — despite increased diversity within the BFD — the City still hires firefighters in accordance with the Beecher decree.
That brings us to the events giving rise to the instant case. In 1998, the Candidates — Joseph Quinn, Sean O’Brien, Robert Dillon, Joseph Sullivan, and Roger Kendrick, Jr. — aspired to firefighter appointments in the BFD. All five are white males; as was required, they identified themselves as non-minority applicants. Each took the firefighter entrance examination administered by the Massachusetts Division of Personnel Administration (MDPA) and scored ninety-nine out of a possible one hundred points.
The Candidates’ scores satisfied the threshold criterion for employment. *25 Along with all other qualifying applicants, they were placed on a civil service eligibility list in rank order. This ranking made allowance for various statutory preferences (e.g., veterans, residents, children of firefighters killed or disabled in the line of duty), ceding pride of place to the holders of such preferences in accordance with state law (even if those persons had earned lower test scores than other qualified candidates). See Mass. Gen. Laws ch. 31, §§ 26, 40. None of these statutory preferences involve race or ethnicity, and none of them are challenged in this proceeding.
Preparing to hire fifty new firefighters, the BFD requested a certified list of eligible applicants from the Massachusetts Human Resources Division (HRD). The HRD selected individuals in rank order (based on statutory preferences and test scores) and grouped them into a putative “hiring class.” After screening out those individuals who stumbled over a variety of race-neutral preconditions (such as drug tests and physical examinations), the HRD composed a slate of “hiring pairs” by placing the highest ranking minority member and the highest ranking non-minority member into a group of two and then repeating the process until the hiring class had been exhausted.
In November 2000, the BFD, following this rank order, chose twenty-five pairs from the eligibility list and appointed those fifty individuals as entry-level firefighters.[2] The Candidates were not among those selected. Although each received a letter from the BFD stating that the vacancies had been filled by persons who outranked him on the certification list, the record suggests that, had the BFD followed a strict rank-order selection process (without any consideration of race or ethnicity), the Candidates (or some of them) likely would have been in the top fifty.
The Candidates (other than Kendrick, who joined the litigation at a later date) then sued the City. They argued that the City impermissibly had used preferences based on race and ethnicity to rank minorities ahead of them on the eligibility list. In the Candidates’ view, this constituted discrimination in violation of the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983 (count 1), Mass. Gen. Laws ch. 151B, § 4 (count 2), and 42 U.S.C. § 2000e et seq. (count 3). The Candidates also attacked another aspect of the hiring process; they argued that requiring them to submit to medical examinations without a conditional offer of employment violated both federal and state law (counts 4-6).[3] The district court granted the motion of the Boston Chapter of the NAACP to intervene as a party defendant. See Fed.R.Civ.P. 24.
The Candidates moved for summary judgment on the first three counts of their complaint or, in the alternative, for a preliminary injunction forbidding the City from filling at least five firefighter positions pending a resolution of the action. They maintained, among other things, that the City should not have applied the Beecher decree to the November 2000 hiring cycle because, by that time, the City had achieved parity in the firefighter force (and, therefore, had met the benchmark for release from the strictures of the decree). The defendants did not controvert *26 the material facts, but, rather, opposed this motion as a matter of law and cross-moved for summary judgment. The district court denied the Candidates’ motion and granted summary judgment for the defendants on counts 1 through 3. This appeal followed. Counts 4 through 6 remain pending before the district court.
II. APPELLATE JURISDICTION
It is too familiar a proposition to require citation of authority that a federal court may not act beyond the scope of its jurisdiction. As a logical corollary, parties cannot confer subject matter jurisdiction on a federal court by waiver or consent. See Prou v. United States, 199 F.3d 37, 42 (1st Cir.1999); United States v. Horn, 29 F.3d 754, 767-68 (1st Cir.1994). Consequently, when a court senses a potential lack of subject matter jurisdiction, it ought to inquire further regardless of whether the parties have raised the issue. BIW Deceived v. Local S6, 132 F.3d 824, 828 (1st Cir.1997). We must conduct such an inquiry here.
In the usual case, an appeal must await the entry of a final judgment, commonly regarded as a judgment that fully disposes of all claims asserted in the action. See Curtiss-Wright Corp. v. Gen. Elec. Co., 446 U.S. 1, 8, 100 S.Ct. 1460, 64 L.Ed.2d 1 (1980); Spiegel v. Trustees of Tufts Coll., 843 F.2d 38, 42 (1st Cir.1988); see also 28 U.S.C. § 1291. There are, however, exceptions to the classic final judgment rule. One such exception, embodied in Rule 54(b) of the Federal Rules of Civil Procedure, allows the immediate entry of a partial final judgment as to fewer than all the claims in a multi-claim action “upon an express determination that there is no just reason for delay.” The district court made such a determination here and directed that a separate and final judgment enter as to counts 1 through 3.
Despite this explicit direction, a jurisdictional problem looms. The law is firmly established in this circuit that a rote recital of Rule 54(b)’s talismanic phrase is not enough, in and of itself, to trump the wonted application of the final judgment rule. See Spiegel, 843 F.2d at 42 (endorsing the “long-settled and prudential policy against the scattershot disposition of litigation”). To warrant recourse to the special procedure envisioned by Rule 54(b), the district court typically must make an individualized assessment of the desirability and effect of an immediate appeal. Id. at 42-43. Thus, if a district court wishes to enter a partial final judgment on the ground that there is no just reason for delay, it should not only make that explicit determination but should also make specific findings and set forth its reasoning. See id.
We have warned that the parties have an obligation to bring this requirement to the district court’s attention. See id. at 44 n. 5. In this instance, the parties did not fulfill this obligation, and the court neither made the requisite findings nor explicated the reasons underlying its Rule 54(b) certification.
Although this deviation from preferred practice is troubling, it is not necessarily fatal. We have noted that there are “infrequent instances” in which the record, on its face, makes it sufficiently apparent that the circumstances support an appeal from a partial judgment. Id. at 43 n. 4. This is such a case.
Counts 1 through 3 of the complaint deal with the obligations and protections afforded by the Beecher decree. In contrast, counts 4 through 6 have very little to do with the decree (and nothing to do with race or ethnicity). Moreover, one of the principal parties — the NAACP — has no knowledge about (and, for aught that ap *27 pears, no interest in) the claims still pending in the lower court. Given the discrete nature of the two sets of claims, the summary judgment decision appears to be “final in the sense that it is an ultimate disposition of ... individual claim[s] entered in the course of a multiple claims action.” Curtiss-Wright, 446 U.S. at 7, 100 S.Ct. 1460 (internal quotation marks omitted).
Equally as important, the proof needed to establish the allegations of counts 1 through 3 is materially different from the proof needed to establish the allegations of counts 4 through 6. By the same token, the legal issues are separate and distinct. Moreover, if the Candidates prevail on one or more of the first three counts and obtain satisfactory relief, counts 4 through 6 may well be rendered moot. This concatenation of circumstances means that, in all probability, there will be no significant duplication of effort in litigating one set of claims to a conclusion and then addressing the remaining set of claims. Such a lack of overlap strongly supports the finding of no just reason for delay (and, thus, the entry of a partial final judgment under Rule 64(b)). See, e.g., Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 580 (1st Cir.1994); Feinstein v. Resolution Trust Corp., 942 F.2d 34, 40 (1st Cir.1991).
The most important factor counseling in favor of allowing an immediate appeal in this case is the public interest. As a practical matter, a final resolution of the issues raised in counts 1 through 3 will have a broad impact on the future of all applicants for firefighter positions in the City of Boston. This is a vital concern, as hiring is ongoing. The district court recognized this consideration when it agreed to render an expedited decision on counts 1 through 3. See Quinn, 204 F.Supp.2d at 157 n. 3. In short, the nature of the issue calls out for immediate resolution: time is
of the essence if for no other reason than that race-based hiring preferences inevitably shift some of the burden of remediation to innocent persons, Wygant v. Jackson Bd. of Educ., 476 U.S. 267, 280-81, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986) (plurality op.), and thus should not remain in place for any longer than necessary to alleviate the effects of past discrimination. See Regents of the Univ. of Cal. v. Bakke, 438 U.S. 265, 308, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978) (plurality op.) (cautioning that such “remedial action [must] ... work the least harm possible”).
To sum up, the “findings” requirement that we have superimposed on Rule 54(b) is important, but it is not to be applied woodenly. When the record and the interests of justice permit, we have on occasion relaxed the requirement. See, e.g., Maldonado-Denis, 23 F.3d at 580-81; Feinstein, 942 F.2d at 40. Given the factors enumerated above — especially the substantial public interest that attaches to an expeditious resolution of whether the Beecher decree should continue to constrain the BFD’s hiring practices — we conclude that this is one of the rare cases in which, despite the absence of detailed district court findings, the conditions for the use of Rule 54(b) effectively have been met. Accordingly, we have jurisdiction over the Candidates’ appeal.
III. ANALYSIS
Having assumed jurisdiction, we turn to the merits of the appeal. We divide our discussion into five segments. First, we frame the issue. We next describe how a court is to assess whether the release point of the Beecher decree — parity—has been achieved, outlining the required comparison and delineating how to arrive at its component parts. Then, we do the mathematics. Finally, we address the question of relief.
*28 A. Framing the Issue.
Parity (or, at least, rough parity) is the key that unlocks the restrictions of the Beecher decree as to a particular community. The central issue in this appeal involves how parity should be calculated for that purpose. The parties agree that the relevant time frame is November of 2000. They also agree as to what sources of data are appropriate for use in this context; all parties accept the City’s breakdown of the BFD’s complement as of the relevant dates and cite data derived from the 2000 census to establish the appropriate labor pool. Their dispute revolves around what categories of this data govern the measurement of parity. The controlling algorithm has two components. One (which we shall call the first variable) relates to how one measures minority penetration within a particular fire department. The other (which we shall call the second variable) relates to how one measures minority representation in the community as a whole.
As to these points, the Candidates argue that, under the Beecher decree, the first variable should be limited to the percentage of firefighters in the BFD (not including officers). This should be compared to the second variable, which they envision as the percentage of minorities in the City’s employment-eligible population. On the other hand, the City and the intervenor contend that the first variable should represent the percentage of minorities in the BFD as a whole (including officers) and that the second variable should comprise the percentage of minorities in Boston’s overall population.
The district court concluded that the doctrine of stare decisis dictated the composition of both variables. In the court’s view, that doctrine required measuring parity by comparing the percentage of minorities in all ranks within the BFD to the percentage of minorities in the City’s overall population. Quinn, 204 F.Supp.2d at 161 (accusing the Candidates of “us[ing] a different statistical method than the one used in the Beecher decree”). Since this calculation did not show that parity had been attained — the percentage of minorities within the BFD, including all ranks, was 31.5%, whereas the percentage of minorities in the overall population was slightly over 38% — the court granted the City’s motion for summary judgment. Id. at 163.
We address the nature of the two variables in the next two sections of this opinion. Before doing so, however, we pause to mention two sets of legal principles. First, because this litigation challenges a judicial decree affording race-based relief, any interpretation of the decree or any application of it in practice must survive strict scrutiny. See Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 235, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995) (“Federal racial classifications, like those of a State, must serve a compelling governmental interest, and must be narrowly tailored to further that interest.”); Stuart v. Roache, 951 F.2d 446, 449 (1st Cir.1991) (concluding that all race-based classifications must pass strict scrutiny). This standard obliges an inquiring court to make a binary finding that the race-based relief is not only justified by a compelling governmental purpose but also narrowly drawn to fit the contours of that purpose. Mackin, 969 F.2d at 1275; Stuart, 951 F.2d at 449.
Second, the district court ruled at the summary judgment stage. The role of summary judgment is to pierce the boilerplate of the pleadings and provide a means for prompt disposition of cases in which no trial-worthy issue exists. See Suarez v. Pueblo Int’l, Inc., 229 F.3d 49, 53 (1st Cir.2000). This device should be employed only when the “pleadings, depo *29 sitions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.” Fed.R.Civ.P. 56(c). We review an order granting summary judgment de novo. Suarez, 229 F.3d at 53. This non-deferential review is particularly appropriate where, as here, the district court’s grant of summary judgment is based on its application of abstract principles of law to essentially uncontradicted facts. See Plumley v. S. Container, Inc., 303 F.3d 364, 369 (1st Cir.2002).
B. The First Variable.
The district court concluded that the first variable to be used for measuring parity under the Beecher decree was the percentage of minority firefighters in the BFD as a whole. The court did not reach this conclusion through independent analysis, but, rather, premised it on the assumption that this issue had been fully litigated and settled in earlier proceedings. See Quinn, 204 F.Supp.2d at 162. Although we appreciate the district court’s sensitivity to the role of precedent, an examination of the prior decisions touching upon the Beecher decree refutes the court’s assumption.
To the extent that the Beecher I court compared relative racial representation using quantitative data, it did so only to determine proper placement of the burden of proof as to what discriminatory effects could be attributed to the defendants’ preexisting recruitment and hiring practices. See 371 F.Supp. at 514, 518-20. Thus, Beecher I did not mandate a particular parity-measuring formula for future use. That omission is understandable: the minuscule number of minorities in the affected fire departments at the time of the original Beecher decree negated any need for precise definition of how to measure anticipated minority penetration.[4]
This court’s initial affirmance of the Beecher decree is unhelpful on this point. In resolving that appeal, we stated that the Beecher decree would “remain[] in force, for each local fire department, until that department attains sufficient minority fire fighters to have a percentage on the force approximately equal to the percentage of minorities in the locality,” Beecher II, 504 F.2d at 1027. This statement begs the question of who is a “firefighter.”
Our subsequent opinion in Mackin likewise left open the issue of how to measure parity. That case rejected an argument that the second variable was the racial composition of the City as it existed in 1974 (when the Beecher decree was first entered). Mackin, 969 F.2d at 1276. We disposed of that argument without ruling on the significance of the figures presented vis-a-vis the composition of the first variable. See id. Elsewhere in that opinion, we addressed an overbreadth challenge and held that the decree continued to survive strict scrutiny. Id. at 1278. In the process, we cited the language of the decree itself as an indicium of its limited life. See id. (acknowledging that the decree would “remain[] in force only until its requirements have been met”). Seen in this light, any elliptical references in Mac-kin as to how parity might be measured cannot be deemed a holding.
Our determination that the district court erred in concluding that stare decisis supplies an answer to the question of how the first variable should be *30 constructed brings us back to square one. While we recognize that “district courts enforcing public law consent decrees have, in general, broad discretion in determining such matters as whether the objectives of the decree have been substantially achieved,” Navarro-Ayala v. Hernandez-Colon, 951 F.2d 1325, 1337 (1st Cir.1991), the court below did not exercise any such discretion. Instead, it offered its interpretation of judicial precedents dealing with the Beecher decree. Having found that interpretation wanting, we owe no particular deference to the district court’s conclusion. See Wessmann v. Gittens, 160 F.3d 790, 795 (1st Cir.1998).
If a district court’s adjudication of a public sector consent decree does not warrant deference, “[ojrdinary contract principles apply” to the same extent as they apply to other consent decrees. Navarro-Ayala, 951 F.2d at 1339. This is especially true when, as now, the question involves determining the parties’ original intent and, concomitantly, the scope of the arrangement to which they initially consented.[5] Id. “Parties to a consent decree are entitled to know that ... [it] will not be treated as a mere entering wedge which ... gives a district court untrammeled discretion to increase” the depth and breadth of judicial supervision. Id. at 1339 n. 17.
Against this backdrop, we turn to the parties’ competing interpretations of the term “firefighter.” As said, the Candidates view that term as encompassing only the lowest rank, that is, entry-level members of the BFD.[6] In contradistinction, the defendants view the term as encompassing all uniformed BFD personnel, including officers. In the abstract, it may seem possible to stretch the term “firefighter” to fit the defendants’ vision — but this case does not deal with abstractions. Terms in a consent decree cannot be construed in a vacuum; they must instead be read in the context of the decree as a whole. See Newport Plaza Assocs. v. Durfee Attleboro Bank, 985 F.2d 640, 646 (1st Cir.1993); see generally 5 Arthur L. Corbin, Corbin on Contracts § 24.21, at 204 (Joseph M. Peril-lo rev. ed.1998). From that coign of vantage, the Candidates’ definition is much more compelling.
The litigation underlying the Beecher decree arose out of discriminatory practices in recruitment and hiring into entry-level positions. See Beecher I, 371 F.Supp. at 509 (describing the focal point of the case as the municipalities’ “overall hiring policies for the position of firefighter”). Consistent with this focus, the district court made specific findings of discriminatory practices in recruitment and hiring, and the decree was tailored to counteract the effects of that discrimination. Id. at 520. This historical perspective sheds considerable light on the meaning of the term “firefighter” as used in the *31 Beecher decree. Logically, the parties must have intended that term to refer to the class of jobs open to external hiring: entry-level firefighter positions. See Fleet Nat’l Bank v. H & D Entm’t, Inc., 96 F.3d 532, 539 (1st Cir.1996) (interpreting terms of a settlement agreement in light of the aim of the litigants at the time of settlement); see generally 5 Corbin, supra § 24.20, at 193. Only by interpreting the term “firefighter” in that manner is it possible to harmonize the wording of the decree with its evident purpose.
Other language in the decree supports this reading. The decree’s first paragraph zeroes in on entry-level positions: it enjoins activities that “discriminat[e] against any applicant or potential applicant for employment.” Beecher I, 371 F.Supp. at 521. The decree purports to regulate the recruiting, certifying, and appointing of entry-level personnel and specifically refers to this three-part process as the “hiring procedure.” See id. at 522. Subsequent amendments, such as the interim consent decrees entered on April 17, 1975, and November 25,1975, continue this emphasis on recruitment and hiring for entry-level positions.
Custom and usage within an affected industry or workplace can be important aids to the construction of a contract or consent decree. See, e.g., Boston Police Superior Officers Fed’n v. City of Boston, 147 F.3d 13, 17-18 (1st Cir.1998) (interpreting terms with otherwise broad usage narrowly according to usage within the relevant profession); Smart v. Gillette Co. Long-Term Disab. Plan, 70 F.3d 173, 179 (1st Cir.1995) (noting that “usages of trade” are relevant to interpreting terms of a contract). Here, the usage of the BFD supports the Candidates’ definition of the term “firefighter.”
In the court below, the evidence showing the composition of the BFD differentiated the various ranks by specific title. These records consistently referred to the entry-level rank as “Firefighter” (sometimes written as “Fire Fighter” or “Fire fighter”). Corresponding to that term, the evidence showed the number of persons serving in the entry-level rank, broken down by race and ethnicity. That evidence referred to the other ranks — the officers — by such titles as “Fire Lieutenant,” “Fire Captain,” and “District Fire Chief,” giving the racial and ethnic composition of each such rank. This indicates that, within the BFD, the term “firefighter” carries with it specific duties, responsibilities, pay, and privileges.
Lexigraphic insights are frequently helpful in determining the meaning of specific words in consent decrees. See, e.g., Gilday v. Dubois, 124 F.3d 277, 285-86 (1st Cir.1997). Here, the mine-run of dictionary definitions tends to support the Candidates’ version of the disputed term. A firefighter is said to be “one who fights fires as a member of a municipal fire department,” Webster’s Third New Int’l Dictionary 855 (1993) (internal dictionary symbols omitted), or “a person who fights destructive fires,” Random House Dictionary of the English Language 722 (2d ed.1987), or, simply, “a person who fights fires,” MerriarfWWebster Ortr-Line Dictionary (2002), at http://www.mw.com/ home.htm. These definitions uniformly emphasize the principal activity that firefighters perform. They show quite clearly that the term “firefighter,” in its ordinary sense, applies more naturally to those whose exclusive province is attempting to extinguish conflagrations as opposed to those in the higher echelons (who must handle a broader and more diversified range of activities, including administration and supervision). While the dictionary definitions of “firefighter” do not necessarily exclude those whom the defen *32 dants seek to include, they argue persuasively against their inclusion.
Our case law also militates against including higher ranks under the appellation “firefighter.” For example, in Boston Police Superior Officers, 147 F.3d at 17-18, we held that the term “police officers” used in a consent decree governing promotions within the Boston Police Department did not include all police officers, but, rather, encompassed only patrolmen. That case, like this one, illustrates the importance of honoring contextual constraints that may be placed on a word or phrase within the four corners of a consent decree.
Last — but far from least — including higher ranks within the compass of the term “firefighter” would mean that the Beecher decree was not narrowly tailored to serve its stated purpose. Such an interpretation would effectively transform an instrument carefully crafted to eliminate discrimination in recruitment and hiring into general leverage favoring minorities in a much wider variety of matters. In most of those areas — promotion is a good example — no justification for systematic preferential treatment of minorities has been established. Thus, the transformation that necessarily would accompany an acceptance of the defendants’ interpretive gloss would present an insurmountable constitutional obstacle. See Bakke, 438 U.S. at 307, 98 S.Ct. 2733. Because courts should avoid construing a consent decree in a constitutionally offensive way if a feasible alternative construction exists, this looming constitutional quandary is itself a cogent argument for rejecting the defendants’ expansive view of the term “firefighter.” Cf. Walsh v. Schlecht, 429 U.S. 401, 408, 97 S.Ct. 679, 50 L.Ed.2d 641 (1977) (“[C]ontraets should not be interpreted to render them illegal and unenforceable where the wording lends itself to a logically acceptable construction that renders them legal and enforceable.”).
The opposite pan of the scale contains nothing of sufficient weight to counterbalance this powerful asseverational array. Insofar as we can discern, interpreting the word “firefighter” to include higher ranks has no basis in the record. The decree is utterly silent as to activities affecting higher ranks, and the remainder of the record — both current and historical — is devoid of any allegation or finding that the BFD has ever discriminated against minorities in promotions or in other personnel practices involving those in (or aspiring to reach) the higher ranks. Indeed, the original Beecher plaintiffs would not have had standing to allege discrimination in such respects.[7] Taking these facts into account, it unfairly belittles the Beecher court to read “firefighter” as that term is used in the decree to include all ranks (and, thus, to impute to the court the injudicious crafting of a remedy that reaches beyond the scope of the surrounding litigation).
The defendants, ably represented, nonetheless advance a plethora of counter-arguments. Only four of them require discussion.
*33 First, the City and the intervenor point to paragraph 11 of the interim consent decree of November 25, 1975. That proviso requires a municipality seeking to be released from the decree to petition the MDPA, informing that agency “that the percentage of post-probationary minority uniformed personnel equals the percentage of minorities” in that municipality. We do not believe that this casual (and wholly unexplained) linguistic switch from “firefighter” to “uniformed personnel” can be accorded decretory significance. This is especially so in light of two facts. First, that same proviso incorporates by reference paragraph 7 of the April 17, 1975 interim consent decree (which opens the way for release from the decree “whenever a particular city or town has achieved a complement of Black or Spanish-surnamed firefighters commensurate with the percentage of minorities within the community”). Second, the preamble to the November 25 decree — the decree which introduced the term “uniformed personnel” into the litigation — unequivocally declared thát “the parties consent to entry of this Agreement to permit ... the establishment of an eligibility list for the position of firefighter .... ” (Emphasis supplied). In the final analysis, then, the phrase upon which the defendants rely leads us back to our starting point.
We add, moreover, that if the phraseology employed in the November 25, 1975 decree was intended to clarify that the earlier decrees affected more than the firefighter rank, it seems highly likely that the Beecher court would have used more precise language such as “of all ranks” or “of any rank.” But the Beecher court eschewed such language. What is more, the court demonstrated an inclination to use general descriptors for specific subject matter. See Beecher I, 371 F.Supp. at 523 (using the general phrase “complement of minorities” to refer to the specific minority “[g]roup of all eligible blacks and Spanish-surnamed persons”). In our view, this proclivity undermines the inference that the defendants (and the dissent) seek to draw from the phrase “post-probationary uniformed personnel.”
Before leaving this point, we note that our dissenting colleague sees “no basis for concluding that ‘firefighter’ is the operative word” in the Beecher decree and the two interim decrees that followed. Yet that word appears no fewer than twenty-six times in those decrees, while the term “uniformed personnel” appears only once. This repeated emphasis, especially when coupled with the fact that the litigation revolved around the position of firefighter and did not concern other ranks, makes it perfectly clear that “firefighter” is indeed the operative term.
Next, the defendants strive to convince us that we should defer to a 1987 memorandum issued by the MDPA, which indicates that, for Beecher purposes, the first variable should consist of “the actual percentage of the authorized uniformed permanent full-time force which is made up of tenured Black or Hispanic officers of any rank.” We are not persuaded.
The deference typically owed by a court to an administrative agency derives from the fact that the agency has been entrusted by a legislative body to administer a statute enacted under that branch’s separate constitutional authority. See Chevron, U.S.A. Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); see also Fireside Nissan, Inc. v. Fanning, 30 F.3d 206, 212 (1st Cir.1994) (reasoning that state officials’ interpretation of state statute is entitled to deference). If the legislative branch has “left a gap for the agency to fill, there is an express delegation of authority.” Chevron, 467 U.S. at 843-44, *34 104 S.Ct. 2778. Thus, a court must defer to the agency’s reasonable construction of a provision in the statute. Id. at 844, 104 S.Ct. 2778.
Here, however, a state agency is helping to administer compliance not with a legislative enactment but with a federal judicial decree. A federal appellate court owes no deference to such an agency when endeavoring to discern the meaning and constitutional limits of such a decree. After all, if the judiciary is the final arbiter as to questions of statutory construction and must refuse to accept administrative interpretations that contradict clearly ascertainable legislative intent, see id. at 843 n. 9, 104 S.Ct. 2778, courts certainly have the power — indeed, the duty — to reject an administrative construction that runs contrary to the manifest intent of a judicial decree.
Third, the defendants posit a variation on the “trickle up” theory. See, e.g., Stuart, 951 F.2d at 452 (“One obvious reason ... why there may have been few black sergeants in the Boston Police Force in 1978 is that the Department had not hired many black police officers before 1970. Since unjustified discrimination accounted for the latter fact, [it] cannot excuse the former.”). They assert that not including higher ranks within the term “firefighter” would diminish the efficacy of the decree and reward appointing authorities for keeping minorities in the firefighter rank (thus perpetuating underrepresen-tation in the higher echelons). For that reason, they argue, it makes sense to require parity department-wide before allowing a community to escape from the constraints imposed by the Beecher decree.
This argument is specious. We have determined, and the defendants concede, that the parties never intended the decree to address promotions. On that basis alone, it would be improper to extend the decree’s reach by judicial fiat. See Boston Police Superior Officers, 147 F.3d at 17-18. Furthermore, alleging that unconstitutional hiring practices within the BFD have caused a disparate impact on the number of minorities in the higher echelons is a heavy charge. Such an allegation should not be addressed in the abstract, but, rather, should be squarely propounded by an injured party with standing to sue and litigated to a just conclusion. Because the litigation giving rise to the Beecher decree is of a different nature than the justification that the defendants now offer, the decree is a constitutionally insufficient vehicle for addressing that justification. See id. at 18; see also Wessmann, 160 F.3d at 802 (“The mere fact that an institution once was found to have practiced discrimination is insufficient, in and of itself, to satisfy a state actor’s burden of producing the reliable evidence required to uphold race-based action.”).
Finally, the City and the intervenor make an argument of last resort. They contend that their interpretation of the term “firefighter” is proper because they have assumed all along that the term embraced more than entry-level personnel. In the circumstances of this case, such a contention does not get them very far.
In pressing this point, the defendants lean heavily upon past practice of the MDPA and attempt to apply language derived from Mackin to that practice. There, we rejected the argument that static 1974 population figures controlled the measurement of parity. In so doing, we wrote that “[f]ew things evidence a decree’s meaning more persuasively than an immutable, decade-old pattern of past practice under the decree, consensually engaged in by all sides in the underlying litigation that produced the decree.” 969 F.2d at 1276.
*35 That language is inapposite here. In Mackin, we were using a uniformly accepted past practice to validate a facially plausible interpretation of the Beecher decree (i.e., that current population figures would control). See id. We deemed that past practice confirmatory of what appeared to be a commonsense reading of the verbiage chosen by the parties and approved by the district court. In contrast, the defendants here attempt to use an administrative practice first inaugurated in 1987 (thirteen years after the entry of the Beecher decree), and never directly challenged, to change the meaning of plain language and thus to validate an unlikely interpretation that is implausible in the context of the underlying litigation (and one which, in the bargain, would open the decree to constitutional attack). To the extent that the MDPA’s past practice points toward that suggested interpretation, it lacks record support and therefore cannot dominate the decisional calculus. See Wessmann, 160 F.3d at 802; Stuart, 951 F.2d at 454-55.
To dwell on this issue would be pointless. It suffices to say that the history and purpose of the litigation, the language of the decree, and the usage of the BFD make manifest that the term “firefighter,” as used in the Beecher decree, was intended to include only those persons serving in the entry-level rank. Interpreting “firefighter” more broadly would rip the decree from its constitutional moorings, twist its language into something alien to its evident purpose, and violate settled principles of contract law. Accordingly, the proper parity-measuring device — what we have called the first variable- — comprises the percentage of minorities in the entry-level rank of the BFD as of the relevant date (November of 2000).
C. The Second Variable.
As for the comparison that Beecher demands — the second variable — the Candidates, citing cases decided after the entry of the original Beecher decree, assert that in affirmative action employment cases minority representation must be measured against the specific adult population that comprises the qualified labor pool. See City of Richmond v. J.A. Croson Co., 488 U.S. 469, 501-02, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989); Local 28 of Sheet Metal Workers’ Int’l Ass’n v. EEOC, 478 U.S. 421, 479, 106 S.Ct. 3019, 92 L.Ed.2d 344 (1986); Stuart, 951 F.2d at 450, 453-54. They insist that any other focus would be unconstitutional and that, therefore, the relevant comparison in this case necessarily must be to Boston’s over-19 black and Hispanic population. See Mass. Gen. Laws ch. 31, § 58 (requiring firefighters to be over 19 years of age).[8]
The district court held that this point previously had been resolved. Quinn, 204 F.Supp.2d at 163. We agree that stare decisis governs. The last time around, we addressed this aspect of the standard for measuring compliance head-on and held that the proper data are the “contemporaneous population figures [for] ... ‘the percentage of minorities within the community.’ ” Mackin, 969 F.2d at 1276 (quoting the Beecher decree). At that time, we considered the very authorities upon which the Candidates now rely and specifically repudiated the notion that the pertinent language of the decree was overbroad. Id. at 1277-78. Thus, principles of stare decisis required the district court to -reject the Candidates’ version of how the second variable should be constructed. See Planned Parenthood v. Ca *36 sey, 505 U.S. 833, 854, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) (recognizing that the doctrine of stare decisis embodies “[t]he obligation to follow precedent”).
If more were needed — and we do not think that it is — we note that the Beecher decree unambiguously requires the use of the percentage of minorities in the general population as the second variable for gauging discriminatory patterns in entry-level hiring. See Beecher I, 371 F.Supp. at 523; see also Mackin, 969 F.2d at 1276 (enumerating portions of the Beecher decree that require, or plainly contemplate, reference to the percentage of minorities in the general population). That requirement is fully consistent with the authorities cited by the Candidates. See Croson, 488 U.S. at 501, 109 S.Ct. 706 (“In the employment context, we have recognized that for certain entry level positions requiring minimal training, statistical comparisons of the racial composition of the relevant population may be probative of a pattern of discrimination.”). Whether or not some other standard might be more precise, the fact remains that the firefighter position is of the type contemplated by the Croson Court. Thus, the parties’ original bargain for a community-wide pool and the district court’s endorsement of that concept are entitled to great weight.[9] See Navarro-Ayala, 951 F.2d at 1339 (reasoning that the district court is best able to decide certain types of parameters in public institutional reform litigation and, thus, is owed deference when the scope of the parties’ original bargain is not at issue).
We reaffirm, therefore, that the appropriate standard for measuring compliance with the Beecher decree- — what we have termed the second variable — consists of contemporaneous population statistics depicting the percentage of minorities within the overall community. It follows that a fire department subject to the Beecher decree will remain so until that department succeeds in demonstrating that it has achieved “the decree’s actual objective: rough parity,” Mackin, 969 F.2d at 1277, measured by establishing the percentage of minorities among entry-level firefighters in the particular department and comparing that ratio to the percentage of minorities within the general population of the local community. When this comparison demonstrates that parity (or, at least, rough parity) has been attained, then the Beecher decree has outlived its usefulness as to that community’s firefighting force.
D. Reworking the Algorithm.
From this analysis, it is evident that the district court erred in constructing the first Beecher variable. In order to determine whether that error affected the Candidates’ substantial rights, see Fed. *37 R.Civ.P. 61, we rework the algorithm using the proper variables. If that algorithm does not yield ratios that show parity (or, at least, rough parity) between the percentage of minorities in the entry-level rank of the BFD and the percentage of minorities in the City of Boston as a whole, then the entry of summary judgment in the City’s favor must stand. See Houlton Citizens’ Coalition v. Town of Houlton, 175 F.3d 178, 184 (1st Cir.1999) (holding that a grant of summary judgment may be affirmed on any independent ground revealed by the record).
On this issue, the parties urging that parity has been achieved (here, the Candidates) bear the burden of proof. See C.K. Smith & Co., Inc. v. Motiva Enter. LLC, 269 F.3d 70, 73 (1st Cir.2001). That is of purely academic interest in this case for the pertinent facts are uncontradicted. The court below developed the factual record sufficiently to demonstrate that, when the City recruited the 2000 hiring class, blacks and Hispanics comprised approximately 40% of the firefighters within the BFD. At the same time, blacks and Hispanics constituted slightly over 38% of Boston’s overall population. Quinn, 204 F.Supp.2d at 162. Hence, parity had been achieved, and the City had become eligible for release from the strictures of the Beecher decree. See Beecher II, 504 F.2d at 1026-27.
Given these facts, the district court’s error was not harmless. After all, a public employer who consents to the use of race as a factor in order to palliate the lingering effects of past discrimination must maintain continuous oversight in order to ensure that the decree works the least possible harm to other innocent persons competing for employment. Bakke, 438 U.S. at 308, 98 S.Ct. 2733. Once parity has been achieved, the decree has served its legitimate purpose, and the justification for it has abated. See id. at 309, 98 S.Ct. 2733. From that point forward, the employer has no basis to continue preferring minorities. See id.; see also Mackin, 969 F.2d at 1276 (“An intrusion by a federal court into the affairs of local government should be kept to a bare minimum and not be allowed to continue after the violation has abated and its pernicious effects have been cured.”).
We conclude, therefore, that the City’s continued resort to race-based preferences from and after the time when parity was achieved fails the second prong of the strict scrutiny analysis. See Bakke, 438 U.S. at 309, 98 S.Ct. 2733. Thus, the City’s adherence to the Beecher decree during the 2000 hiring cycle was unconstitutional. Consistent with the foregoing, we reverse the district court’s entry of summary judgment in favor of the City and direct the court to enter judgment in the Candidates’ favor.
E. Relief.
Our holding does not end the matter: there remains the question of what remedy is appropriate under the circumstances. That is a highly ramified question, the answer to which is subject to the push and pull of competing centrifugal and centripetal forces.
On the one hand, a public employer’s good faith reliance on a consent decree entered to remedy the effects of past discrimination should not lightly be disturbed. See, e.g., Boston Police Superior Officers, 147 F.3d at 25. That proposition has particular bite as to the firefighters who were appointed to the BFD during the 2000 hiring cycle, for the Beecher decree does not directly dictate hiring decisions, but, rather, simply directs municipalities to take affirmative action concerns into account in choosing among qualified *38 applicants. See Mackin, 969 F.2d at 1278 (explaining that “only qualified minority candidates are specially advantaged; no minority candidate is placed on the eligibility list unless he or she has attained a passing score on the entrance examination”) (emphasis in the original). Constitutional violations rarely, if ever, justify the reversal of specific employment decisions previously made by government employers insofar as those decisions affect innocent parties. See, e.g., Boston Police Superior Officers, 147 F.3d at 25; cf. Wygant, 476 U.S. at 282-83, 106 S.Ct. 1842 (“Denial of a future employment opportunity is not as intrusive as loss of an existing job.”). The history of this case offers a striking example of this truism: the Beecher court, despite its finding of pervasive past discrimination, did not disturb the livelihood of those firefighters who were on the force in 1974. See Beecher I, 371 F.Supp. at 520 (noting the need to “preserv[ej morale within the fire departments”).
On the other hand, we have acknowledged that when job applicants have been denied equal protection of the laws by a public employer, “[t]he result, not the specific intent, is what matters.” Beecher II, 504 F.2d at 1021 (citation and internal quotation marks omitted). In that spirit, the original Beecher court invoked its equitable powers to fashion affirmative relief for a perceived injury even after explicitly disavowing any finding that the “exclusionary policy [giving rise to the litigation] ha[d] been followed intentionally or by design.” Beecher I, 371 F.Supp. at 519.
Here, the Candidates have neither offered any evidence that the City acted in bad faith nor otherwise set forth a plausible basis that would justify a court in second-guessing the specific decisions made by the City in the 2000 hiring cycle. In a similar vein, they have not established that the persons actually hired were either complicit in some scheme or somehow undeserving of their appointments. Consequently, there is no principled basis for turning back the clock and revoking those appointments.
That does not mean, however, that the Candidates are entitled to no more than a handshake or a tip of the hat. The fact remains that they have succeeded in showing that the City applied a consent decree, previously held to be constitutional, for too long. The result was that the City infringed the Candidates’ constitutional rights when it acted upon their applications for appointment to the BFD. They should at least have had the opportunity to compete for the positions that they coveted free of the constraints imposed by the Beecher decree. See Bakke, 438 U.S. at 308, 98 S.Ct. 2733. Balancing these competing considerations, we hold that the BFD’s decisions to appoint specific individuals during the 2000 hiring cycle were valid exercises of its responsibility to provide the citizens of Boston with a full complement of qualified firefighters. See Beecher I, 371 F.Supp. at 520. Nevertheless, the application of the decree to the 2000 hiring cycle violated the Candidates’ constitutional rights by depriving them of an equal opportunity to compete for positions on the BFD. See Bakke, 438 U.S. at 308, 98 S.Ct. 2733. On remand, the district court must sort through this tangle and determine, in its sound discretion, the appropriate remedy for the Candidates’ injury (excluding, however, any form of relief that would require dismissal of any provisionally or permanently appointed firefighter currently serving in the BFD).
IV. CONCLUSION
The goal of the Beecher decree was to eliminate discriminatory practices in the recruitment and hiring of firefighters in communities subject to the Massachusetts *39 Civil Service laws, and, relatedly, to remedy the effects of past discrimination in recruitment and hiring. Remediation has taken more than a quarter-century. At long last, however, that objective has been achieved with respect to the BFD; parity has been reached between the percentage of minority firefighters in the BFD and the percentage of minorities in the City as a whole.[10]
Although this is a significant landmark along the road to equality, we add a word of caution. We are not Pollyannas, and we recognize that achieving parity at the firefighter level is not tantamount to saying that all is well in regard to racial and ethnic issues within the BFD as a whole. To the extent that inequalities remain, however, they are not within the compass of either the Beecher decree or this litigation. Nor will we reach out for them — issues of constitutional magnitude should not be the subject of speculation, but, rather, should be litigated fully by parties with standing to represent various pertinent points of view. For today, we fulfill our responsibility by holding that the City’s appointment of firefighters ought no longer be subject to the strictures of the Beecher decree. We need go no further.

The judgment of the district court is reversed and the case is remanded for further proceedings consistent with this opinion. Costs are to be taxed in favor of the appellants.

. Throughout the litigation, the parties have used the term "blacks” as opposed to "African-Americans.” For historical coherence, we henceforth will adhere to that usage. For ease in reference, however, we elect to use the term "Hispanics” as a proxy for the more cumbersome "Spanish-surnamed individuals.” Finally, we use the words "minority” and "minorities” to refer to blacks and Hispanics collectively, and the word "non-minority” to encompass all other persons.

. The parties skirmish over both the construction of the eligibility list and what deviations, if any, the BFD entertained from it. Although these disputes ultimately may prove material in addressing the relief to which the Candidates may be entitled, see infra Part III(E), we leave them unresolved for purposes of this appeal.

. These counts are not in issue on this appeal, see infra Part II, and we therefore omit any detailed discussion of them.

. By way of illustration, the BFD had a minority complement at the time of less than 1%, while Boston had a minority population of approximately 23%. Beecher I, 371 F.Supp. at 514.

. Our dissenting colleague chastises us for giving the Candidates too much credit. He says that the Candidates do not argue that the parties’ original intent encompassed only the entry-level rank. That is literally true, but it overlooks the fact that the Candidates place the scope of the decree squarely at issue and argue that constitutional principles require such an interpretation. To address that argument, our analysis necessarily begins with a "determination of the parties’ intent when they entered into the stipulation.” Navarro-Ayala, 951 F.2d at 1339.

. Throughout, all references to "entry-level” positions should be understood to mean post-probationary non-officer positions. This qualification is compelled by explicit language in the Beecher decree enjoining "further certifications of permanent appointments ... to the position of firefighter" until certain requirements of the decree are met. Beecher I, 371 F.Supp. at 521 (emphasis supplied). That reference is reinforced by language in the decree that differentiates between permanent and provisional appointments. Id.

. Beecher was a consolidated set of class actions in which the district court certified two classes. The first class consisted of "[a]ll black or Spanish-surnamed persons who have applied for the position of firefighter in any fire department ... subject to Massachusetts Civil Service law, but have not become eligible for appointment under existing requirements.” Beecher I, 371 F.Supp. at 510. The other class included ‘‘[a]ll black or Spanish-surnamed persons who have never applied for the position of firefighter because they have allegedly been deprived of information concerning firefighter employment opportunities as a result of the allegedly discriminatory recruitment practices of the defendants.” Id.

. This statute currently imposes an upper age limit (32) for new firefighters. See Mass. Gen. Laws ch. 31, § 58. Because no maximum age applied to the November 2000 hiring cycle, we do not dwell on this feature.

. We note that the district judge who actually entered the Beecher decree (Judge Freedman) made specific mention that, in 1974, the BFD required applicants to be within an age range of 19-35 years. Beecher I, 371 F.Supp. at 512. He also observed that, prior to 1971, the minimum age had been 21. Id. Mindful of this shift, he concluded that the community population as a whole would be an appropriate measure of compliance. This seems supportable in light of Judge Freedman's recognition that the enjoined party had the power to reconfigure the contours of the labor pool. The authorities cited by the Candidates involve parties without such leverage vis-a-vis the reach of the remedy; where such leverage exists, however, measuring parity against general population statistics prevents a public employer enjoined for discriminatory practices in violation of federal law from manipulating the remedy to suit its fancy. So viewed, Judge Freedman’s shaping of the second variable is a good example of why “broad judicial discretion [is often] crucial for the district judge to secure complex legal goals.” Navarro-Ayala, 951 F.2d at 1338 (citations and internal quotation marks omitted).

. Our dissenting brother never squarely addresses the Candidates’ argument that "even assuming that general population statistics are to be considered, the minority composition of the Department’s firefighters (39.9%) exceeded the minority composition of the general population of Boston (38.3%). The examination of parity should focus on minority representation in the firefighter position alone .... The racial preferences at issue apply solely to the firefighter position.” Appellants’ Brief at 23 (internal cross-references and paragraph structure omitted). This is a changed circumstance requiring an examination into “whether the goals of the litigation ... have been completely achieved,” Mackin, 969 F.2d at 1275, as well as a question posed for the first time involving the decree's constitutional application. Viewed in either fashion, the question warrants strict scrutiny. See Rufo v. Inmates of Suffolk County Jail, 502 U.S. 367, 384, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992); see also Adarand, 515 U.S. at 235, 115 S.Ct. 2097. Our dissenting brother, however, says only that he "cannot imagine that the plaintiffs in the Beecher litigation would have decided upon a remedy that provides incentives [to keep minorities in the entry-level rank].” This is the stuff not of strict scrutiny but of rational basis review. See, e.g., FCC v. Beach Comm'ns, Inc., 508 U.S. 307, 315, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993) (upholding law under rational basis review “based on rational speculation unsupported by evidence or empirical data”).