470 F.Supp.2d 1013 (2005)
Michael MARTINEZ, Plaintiff,
v.
CITY OF ST. LOUIS, et al., Defendants.
Eric Deeken, Plaintiff,
v.
City of St. Louis, et al. Defendants.
Nos. 4:01CV580, 4:01CV1770.
United States District Court, E.D. Missouri, Eastern Division.
February 24, 2005.
*1014 *1015 Clyde E. Craig, Clyde E. Craig, P.C., Chesterfield, MO, Charles W. Bobinette, Uthoff and Graeber, St. Louis, MO, for Plaintiff Michael' Martinez and Eric Deeken.
Nancy R. Kistler, Kathleen G. Tanner, St.' Louis City Counselor, Wesley D. Wedemeyer, St. Louis, MO, Benjamin Blustein, Washington, DC, for Defendants.

MEMORANDUM AND ORDER
NANGLE, District Judge.
In 2001, Michael Martinez and Eric Deeken, two white individuals who unsuccessfully sought entry-level appointments as firefighters in the St. Louis Fire Department (the "Fire Department"), filed complaints, against the City of St. Louis (the "City") alleging unlawful reverse discrimination. Cross motions for summary judgment as to the City's substantive liability (Does. 128, 130) are before the Court.

I. Background
In 1974, two causes of action[1] (the "1974 cases") arose out of an employment dispute involving the Fire Department and implicating civil rights. In those actions, which were subsequently consolidated for adjudication, the Firefighters Institute for Racial Equality ("F.I.R.E."), ten black individuals, and the United States asserted that underrepresentation of blacks in the *1016 uniformed ranks of the Fire Department reflected a pattern or practice of unlawful racial discrimination by the City against blacks in the hiring, promoting, and operating practices within the Fire Department.
A. The 1976 Order: Adoption of the Remedial Plan
After extensive conferences, the parties to the 1974 cases jointly submitted a partial consent decree which purported to correct a conspicuous racial imbalance in the ranks of City firefighters. In order to bring to an end the racial tensions in the fire department, the Court adopted and issued the consent decree in 1976. The consent decree contained the following remedial plan:
The defendants shall, as a long range goal, seek to recruit and hire blacks in sufficient numbers so as to achieve a racial composition. . . . of Firefighters in the St. Louis Fire Department which is comparable to the civilian labor force for the City of St. Louis subject to the availability of qualified applicants. In order to fulfill this goal and subject to the availability of sufficient qualified black applicants, defendants shall adopt and seek to achieve a goal of hiring blacks for at least fifty percent (50%) of the vacancies for the entry level of Firefighter personnel in the Fire Department for each year during the life of this decree. . . . At anytime after five (5) years from the date of entry of this partial decree, defendants may move this Court . . . for dissolution of this partial decree; and upon their showing that the goals of this decree in, providing equal opportunity have been fully achieved, the decree may be dissolved. 410 F.Supp. 948, 960-62 (E.D.Mo.1976); 418 F.Supp. at 384-86 (E.D.Mo.1976), aff'd in part, rev'd in part on other grounds in 549 F.2d 506 (8th Cir.1977).
B. The 1990 Order: Denial of Motion to Modify or Dissolve the Consent Decree
In 1990, the United States filed a motion to modify the consent decree by dissolving the long-range hiring goal and compelling the City to utilize lawful selection procedures in filling entry-level probationary fire private positions. The United States argued that the race-based hiring goal was no longer warranted because approximately 32 percent of the ranks of non-probationary fire privates in the Fire Department were black and the 1980 census showed that blacks represented 14.5 percent of the total civilian labor force and 15.7 percent of the civilian labor force between the ages of 20 and 29 in the St. Louis Standard Metropolitan Statistical Area ("SMSA").[2] The City, defendant in the 1974 cases, opposed the United States's motion, contending that the civilian labor force for the City proper (with 41 percent black representation) was the relevant labor market for comparison with black representation in the fire private ranks.
The Court was called upon to consider modification of the consent decree on motion of one of the parties who had initially proposed the consent decree. The motion was opposed by other parties to the consent decree. The Court, mindful of precedent that "the party seeking *1017 modification bears the heavy burden of demonstrating that new and unforeseen conditions have produced such extreme and unexpected hardship that the decree is oppressive," Order of October 1, 1990, at p. 4 (quoting United States v. City of Fort Smith, 760 F.2d 231, 233 (8th Cir. 1985)), declined to modify or dissolve the decree.
C. The 2003 Order: Dissolution of the Consent Decree
In 2001, plaintiffs Martinez and Deeken filed the instant cases alleging unlawful reverse discrimination. The cases were subsequently consolidated for adjudication and transferred to this Court. Order of October 7, 2002 (Perry, J.)(Doc. 54). Thereafter, the Court consolidated the present cases with the 1974 cases. Order of December 30, 2002 (Doc. 65).
In 2003, upon motions of the plaintiffs and two white intervenors, the Court dissolved the consent decree. Order of November 5, 2003 at p. 16 (Doc. 118) Dissolution was necessary because the manifest racial imbalances which the consent decree purported to correct had been eliminated, and, as a result, the consent decree's once constitutionally sound remedial plan no longer addressed a compelling governmental purpose. See id. at pp. 8-16. Before this time, the Court became concerned that a change in the relevant labor market might be appropriate; hence, its Order of March 20, 2003 (Doc. 79) requesting the parties to brief this question.

II. The Summary Judgment Motions
In April 2004, the City and plaintiff Deeken filed the instant cross motions for summary judgment as to the City's substantive liability to Deeken. Plaintiff Martinez joined in Deeken's motion.
A. The City's Motion
In support of its motion, the City contends that because its actions were taken in good faith reliance upon a valid consent decree that imposed no affirmative obligation upon the City to move for dissolution of the decree, the City, as a matter of law, is not liable to plaintiff Deeken.
In opposing the City's motion, Deeken asserts that there is, at minimum, a factual dispute as to whether the long range goal of the consent decree had been achieved at the time when Deeken applied for the position of probationary fire private and that, if the goal had been met prior to the time of his application, the City had no right to rely upon the consent decree.
B. Deeken's Motion
In support of his motion, Deeken argues, in essence, (1) that the appropriate relevant geographic labor market area is the St. Louis SMSA, (2) that prior to 1998, the percentage of blacks in the fire private rank had already exceeded the percentage of blacks in the SMSA civilian labor force, (3) that beginning in, or prior to, 1998, the City's reliance on the consent decree for permission to continue to make race-based hiring decisions was unreasonable in light of Title VII and the equal protection clause of the Fourteenth Amendment, (4) that it necessarily follows that there is no material fact to be determined at trial regarding the City's liability, and (5) thus, as a matter of law, the City is liable to Deeken.
In opposing Deeken's motion, the City argues, in essence, (1) that the SMSA is not the appropriate labor market geographical area (as reaffirmed by the 1990 Order), (2) that even if the City had not declined to certify Deeken as a qualified candidate, he may not have been hired, (3) that the permissive language in the consent decree that the City "may" move for dissolution imposes no affirmative duty upon the City to so move, (4) that the City *1018 was obligated to follow the terms of the consent decree while it was in effect, and (5) thus, as a matter of law, the City is not liable to Deeken.

III. The Facts
The parties have jointly submitted stipulations of fact (Doc. 152, pt. 1), all of which are hereby incorporated by reference in this opinion. Except as otherwise noted, the following undisputed facts are taken from those stipulations.
A. The SMSA
The SMSA consists of the following cities and counties in Missouri and Illinois: Clinton County, Il., Jersey County, Il., Madison County, Il., Monroe County, Il., St. Clair County, Il., Crawford County, Mo. (part), Franklin County, Mo., Jefferson County, Mo., Lincoln County, Mo., St. Charles County, Mo., St. Louis County, Mo., Warren County, Mo., and St. Louis City, Mo. (Stip.65)
B. Scope of Recruitment for Entry-Level Firefighter Positions
Between 1998 and November 5, 2003, the City engaged in recruitment efforts at locations outside the City of St. Louis. (Stip. 63 & Doc. 152 pt. 1 at pp. 23, 25) The City placed advertisements in the City Journal and St. Louis newspapers, mailed notices to more than 1000 interested persons registered with the City personnel department and to more than 100 agencies in the attending job fairs in the City and in St. Louis County, made public service announcements on local radio stations, attended job fairs in the City and in St. Louis County, recruited on college campuses in the City and St. Louis County, and sent notices to institutions of higher learning with a 30-mile radius of the City. (Stip.63) The placing of newspaper ads was very effective in reaching many people. (Stip.64) The City has received a big response from, in particular, the St. Louis Post Dispatch and, to a lesser degree, the St. Louis American. (Stip.64)
C. Residences of Applicants for Entry-Level Positions
In 2003, the City received 1,056 applications for the position of probationary fire private. Of those applicants, approximately 55 percent reported that they resided in the City proper and approximately 45 percent reported that they resided outside the City proper (including 15 percent outside Missouri). (Stip.66)
In 2001, the City received approximately 931 applications for the position of probationary fire private. Approximately 65 percent of those applicants reported that they resided in the City proper and approximately 35 percent reported that they resided outside the City proper (including 20% outside Missouri). (Stip.67)
The City received 2,634 applications from individuals regarding the 1998 fire private hiring process. (Stip.68) In October 2000, the 1998 eligible list expired, after which the City lost data (due to software conversion in late 2000) and destroyed data containing the residences of applicants who had submitted applications but who had not been appointed as probationary fire privates. (Stips.69, 70) Deeken asserts that one City-produced document shows that of 1,541 persons who failed the written portion of the 1998 examination (some having failed to appear to take the exam), approximately 66 percent reported residing in the City, and approximately 35 percent reported residing outside the City (including 12% outside Missouri). (Doc. 152 pt. 1 at p. 12).[3]
The facts are complicated, however, by the fact that the City's Charter requires *1019 that "vacancies in higher competitive positions, so far as practicable [be filled] by means of promotion on competitive examination. . . . Promotion on competitive examination shall be deemed to be practicable whenever there are qualified employees in positions of lower classes who are willing to compete." (Doc. 137 at 5, citing the City Charter, art. XVIII, § 3(e)).
The City's Civil Service Rules further illuminate this process. To be eligible for a promotion, an employee must be a "permanent employee," which is an employee who has successfully completed a working test period and whose permanent appointment has been recommended by the appointing authority and approved by the Director of Personnel. (Doc. 137 at 5 n. 3, citing City of St. Louis Civ. Serv. R. I, § 1(ii) & (gg)). Finally, the charter provides that all City employees, with certain limited exceptions, establish residency within the City proper within 120 days of their appointment. (Doc. 83 at 5).
Counsel for the City represented at the hearing on November 17, 2004, that 75 percent of the firefighter appointees under the 1998 test were from the promotional list, meaning that they were current City employees living within the City limits before being hired as firefighters. (Doc. 173 at 8) Counsel further represented that 100 percent of the firefighter appointees under the 2001 test were from the promotional list, meaning that every candidate hired as a firefighter based upon the 2001 test was already a City resident before being hired. (Doc. 173 at 9)
D. Plaintiff Deeken (Stips.71-96)
Plaintiff Eric Deeken is a white male born on July 12, 1963. In 1998, Deeken was a resident of the City. In 1998 Deeken took and passed the written and physical examination components of the 1998 testing process and satisfied the criminal background requirements for probationary fire private. Deeken was placed on the eligible list with a composite score of 94.864. In the fall of 1998, the City notified Deeken that he ranked first of all applicants on the "open list" (those eligible individuals who were not already City employees) for probationary fire private.
In September 1999, the City appointed 15 black candidates with scores lower than Deeken's from the open list to the position of probationary fire private. In response to a requisition submitted on December 28, 1999, the personnel department submitted to the Fire Department a list of candidates for appointment to the position of probationary fire private from the promotional and open lists. The lists were divided according to race. Twenty-eight (28) white candidates were listed on the "promotional list" (the list of eligible certified individuals who were already employees of the City). The second list certified 7 black candidates from the promotional list and 34 black candidates from the open list. No white candidates were certified to the Fire Department from the open list. The City made appointments from the lists of certified candidates. Not all candidates who had been certified were appointed.
In March 2000 the City hired 17 black candidates from the open list as probationary fire privates. In June 2001 the City hired 5 black candidates from the open list as probationary fire privates. In late October through early November of 2001, the City hired 9 black candidates from the open list as probationary fire privates. Each of the black hirees had composite scores lower than Deeken's score. Deeken was not hired.[4]
*1020 The appointments in September 1999, December 1999, March 2000, June 2001 and between late October through November 2001 from both the promotional list and the open list did not include Deeken, who had been ranked first on the open list in 1998. Obviously, the City passed over him because it relied on the 1976 consent decree. In doing so, the City ignored the many indications that the old geographic area definition, limited to the city limits, was outdated and no longer represented the actual relevant labor market, shown by the recruitment activities of the City and the applicant flow, discussed herein. The language of the consent decree invited the City to seek "dissolution of this partial decree; for and upon their showing that the goals of this decree in providing equal opportunity have been fully achieved, the decree may be dissolved." By 1998 there were obvious changes in the demographics of metropolitan St. Louis, yet the City did nothing.
E. Plaintiff Martinez (Stips.101-122)
Plaintiff Michael Martinez is an adult white male citizen of the United States who was born on February 4, 1973. Martinez resides in the City. After the 1998 eligible list for probationary fire private positions was established, and during the life of the 1998 list, Martinez was a permanent full-time civil service employee of the City. In 1998 Martinez took and passed the written and physical components of the 1998 testing process for probationary fire private. He was placed on the eligible list during the 1998 selection process with a composite score of 83.068. The City notified Martinez that he was ranked No. 67 on the promotional list of all eligible applicants for the position of probationary fire private.
In March 1999 the City appointed as probationary fire privates eight (8) black candidates with lower composite scores than Martinez's score. In 2000, the City having exhausted the list of then eligible black candidates on the 1998 promotional list, Martinez was advanced on the eligible list to second alternate. The first alternate was hired. Martinez was not hired but is currently within the list of the top 20 potentially certifiable candidates.

IV. Legal Standards And Conclusions of Law
A. Summary Judgment Standard
Summary judgment serves to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Fed.R.Civ.P. 56 advisory committee's note, cited in Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Summary judgment is appropriate only when the pleadings, depositions and affidavits submitted by the parties indicate no genuine issue of material fact and show that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c).
The party seeking summary judgment must first identify grounds demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Such a showing shifts to the nonmovant the burden to go beyond the pleadings and present affirmative evidence showing that a genuine issue of material fact exists. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256-57, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, *1021 475 U.S. at 586, 106 S.Ct. 1348. "They must show there is sufficient evidence to support a jury verdict in their favor." Nat'l Bank of Commerce v. Dow Chem. Co., 165 F.3d 602, 607 (8th Cir.1999). "Factual disputes that are irrelevant or unnecessary will not be counted," Anderson, 477 U.S. at 248, 106 S.Ct. 2505, and a mere scintilla of evidence supporting the nonmovant's position will not fulfill this burden, see id. at 252, 106 S.Ct. 2505.
B. Federal Employment Discrimination Standards
The United States Code provides that "[i]t shall be an unlawful employment practice for an employer to fail or refuse to hire . . . any individual . . . because of such individual's race. . . ." 42 U.S.C. § 2000e-2 (a)(1). Although the equal protection clause of the Fourteenth Amendment provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws," U.S. Const. amend. XIV, cl. 1, federal law permits enforcement of an affirmative action plan that is temporary, purports to correct a manifest racial imbalance in the workforce, and does not unnecessarily trammel the rights of the unfavored group consisting of innocent individuals, see United States v. Paradise, 480 U.S. 149, 183, 107 S.Ct. 1053, 1073, 94 L.Ed.2d 203 (1987); United Steelworkers of Am. v. Weber, 443 U.S. 193, 195, 99 S.Ct. 2721, 2724, 61 L.Ed.2d 480 (1979); cf. also Johnson v. Transp. Agency, 480 U.S. 616, 637, 107 S.Ct. 1442, 1455, 94 L.Ed.2d 615 (1987) (addressing sex-based hiring decisions).
C. Standards Governing Affirmative Action Consent Decrees
1. Validity
The validity of a consent decree's affirmative action plan is a question of law to which strict scrutiny applies. E.g., Donaghy v. City of Omaha, 933 F.2d 1448, 1458 (8th Cir.1991). Application of strict scrutiny necessitates that the plan have a remedial purpose as evidenced by a conspicuous racial imbalance in the work force and that the plan be narrowly tailored to accomplish the remedial purpose. See id. at 1457 ("[N]arrowly tailored, remedial, race-conscious employment decisions are permitted under the Constitution").
"[C]onsent decrees bear smile of the earmarks of judgments entered after litigation. At the same time, because their terms are arrived at through mutual agreement of the parties, consent decrees also closely resemble contracts." Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland, 478 U.S. 501, 519, 106 S.Ct. 3063, 3073, 92 L.Ed.2d 405 (1986); see also Donaghy, 933 F.2d at 1459 (noting that a consent decree is a "hybrid" with attributes of both contracts and judicial decrees). A federal consent decree "must further the objectives of the law upon which the complaint was based." Frew v. Hawkins, 540 U.S. 431, 124 S.Ct. 899, 904, 157 L.Ed.2d 855 (2004); Local 93, 478 U.S. at 525, 106 S.Ct. 3063. Thus, an affirmative action consent decree is valid only insofar as it follows precedent construing the equal protection clause to the Fourteenth Amendment as applied to Title VII.
Even though a consent decree is an order of a court, continuing decisions made upon reliance on a consent decree are not unassailable. See Donaghy, 933 F.2d at 1456 (opining that "the flaw in the " district court's decision was that the [court] `may have been affected by the mistaken view that respondents' claims on the merits were barred to the extent they were inconsistent with the consent decree.'") (quoting Martin v. Wilks, 490 U.S. 755, 769, W9 S.Ct. 2180, 2187, 104 L.Ed.2d 835 (1989), superceded by statute as stated in, e.g., United States v. City of Chicago, 978 F.2d 325, 330 n. 5 (7th Cir.1992)). *1022 Indeed, affirmative action decrees are not favored unless they are "temporary and will terminate when the manifest [racial] imbalances have been eliminated." Bhd. of Midwest Guardians, Inc. v. City of Omaha, 9 F.3d 677, 680 (8th Cir.1993) (quoting Paradise v. Prescott, 767 F.2d 1514, 1531 (11th Cir.1985)) (quoting United States v. City of Alexandria, 614 F.2d 1358, 1365 (5th Cir.1980)). Actions taken by an employer pursuant to a bona fide affirmative action plan, however, do not necessarily show reverse discrimination. Donaghy, 933 F.2d at 1458.
2. The Relevant Market Geographic Area
a. Import of the Relevant Geographic Area
The relevant geographic market area affects the compelling governmental interest question in that the minority-to-nonminority ratio may be significantly different in a smaller area than in a larger area encompassing the smaller area, thereby affecting a determination of whether a compelling governmental remedial purpose justifies race-based hiring decisions by virtue of reliance on an affirmative action plan. The proper geographical boundaries of the relevant labor market are thus a necessary factual determination in identifying pattern-and-practice discrimination.
Even as "properly identifying the relevant labor market is the key ingredient in proving Title VII discrimination through the use of statistics," Bennett v. Roberts, 295 F.3d 687, 697 (7th Cir.2002), such identification is also key to making appropriate comparisons for purposes of determining whether a racial parity goal has been met.
b. Applicant Flow as Indicator of Relevant Market Geographic Area
Absent attempts to limit the labor market pool, the "relevant labor market" is the population of workers who, among other things, live within the geographical area from. which that employer's employees and job applicants are drawn. See Rivera v. City of Wichita Falls, 665 F.2d 531, 540-41 (5th Cir.1982) (noting that source of relevant labor market is almost always defined in part in geographical terms), rev'd on other grounds.
"Applicant flow" refers to all actual applicants who are qualified to apply and to be considered for the position or positions at issue. Provided that the applicant flow is not tainted by discriminatory recruiting practices and is not otherwise biased or distorted, applicant flow is a reliable indicator of an employer's relevant labor market. See E.E.O.C. v. Olson's Dairy Queens, Inc., 989 F.2d 165, 168-69 (5th Cir.1993) (holding that EEOC established prima facie disparate impact case in presenting statistical evidence comparing work force of employer with labor pool consisting of geographical area from which applications were received).
In 1990, the Court denied the motion of the United States to modify or dissolve the consent decree based on the lack of demonstration of "new or unforeseen circumstances."[5] The statistics concerning the "applicant flow" and the SMSA were not provided to the Court until it requested them in its Order of March 20, 2003 (Doc. 79). The question has also been raised herein by nonparties to the consent decree, who have allegedly been detrimentally affected by the City's continuing adherence to the remedial plan set out in the decree.[6] *1023 The City's recruitment activities and the applicant pool make a strong argument that the relevant market geographic area from which the comparisons should have been drawn for purposes of determining when racial parity had been reached is more expansive than the City proper. The City actively and continually channeled recruitment efforts within an area more expansive than the. City. (Stip. 63, Doc. 152 pt. 1), and the City accepted and processed applications from individuals living outside the City proper (Stips.66, 67, 68, Doc. 152, pt. 1) but within the area to which the parties have stipulated to be the SMSA.
Where, as here, there is no allegation that an employer unlawfully attempted to limit or manipulate the labor market pool, the relevant labor market would ordinarily be the population of interested workers qualified to perform entry-level jobs who live within the geographical area from which that employer's employees and job applicants are drawn. Plaintiffs cite no shortage of cases for the proposition that the labor market should include the larger geographic area from which applications are received rather than the smaller geographic from which hirees are actually drawn due to an allegedly discriminatory hiring scheme.
Mindful of the changing workforce and residential demographics, the Court finds that a geographic area encompassing the SMSA is the most appropriate geographical area for determining the relevant labor market. See Hammon v. Barry, 826 F..2d 73, 78 & n. 8 (D.C.Cir.1987) (stating that looking only to labor force in smaller population of District of Columbia provided "an entirely artificial comparison" because fire department recruited and hired approximately 50 percent of its employees from the Maryland and Virginia suburbs) ("Until conditions change, we will not bury our heads in the sand, ostrichlike, by ignoring the metropolitan area [from] whence the entry-level firefighters actually come.").[7]
St. Louis was once one of the largest cities in the United States (eighth in size). During the years since then it has steadily lost population, now perhaps three-eighths of what it once was. While this decline may have begun as "white flight," it long ago lost any possible racial overtones. Now people of all colors have been leaving St. Louis for what they deem will be a better life in the suburbs.[8] The Civil Service Rules allowing a 120 day moving period to prospective hirees living out of St. Louis was a step toward seeking a larger employment market. And a larger pool from which to hire personnel certainly is beneficial to providing good municipal service.
Changing Civil Service Commission rules and regulations are, of course, well beyond the authority of this Court, and properly so. However, the Civil Service Commission and its staff must have been *1024 aware of these changing demographics. This awareness should cause any person on the Commission interested in securing the best possible firemen to realize that the continued use of the City of St. Louis proper as its relevant geographic area was outdated. In 1990 it was not, but many demographic changes have occurred since then. The City itself recognized this by engaging in the widespread recruitment efforts referred to in IIIB, above, beginning at least by 1998.[9]
D. The Civil Service Commission was Remiss in its Failure to Address the Significance of the SMSA Statistic and the Applicant Flow Statistics
The Court concedes that the City's actions were, to a certain extent, driven by the political realities.[10] The Court in fact ruled in the past that "[w]hile it is true that the long-range hiring goal and remedial plan do not expire automatically, the City is not obligated to move for dissolution of the decree." Order of October 1, 1990, at p. 18. The Court hereby reconsiders this aspect of the law of the case, however, holding that the City should have moved for the amendment or dissolution of the consent decree upon noticing the changing circumstances set out above.
The Court also takes notice of the line of cases within the First Circuit which impute to a public employer a duty to monitor the ongoing constitutionality of a consent decree and hold such employer liable even for actions compelled by an otherwise presumptively valid consent decree. See, e.g., Quinn v. City of Boston, 325 F.3d 18,. 37 (1st Cir.2003); see also Deleo v. City of Boston, No. 03-12538-PBS, at * 26 (D.Mass. Nov. 23, 2004). The principle embraced by the First Circuit is that "a public employer who consents to the use of race as a factor in order to palliate the lingering effects of past discrimination must maintain continuous oversight in order to ensure that the decree works the least possible harm to other innocent persons competing for employment." Quinn, 325 F.3d at 37 (citing Regents of Univ. of Cal. v. Bakke, 438 U.S. 265, 309, 98 S.Ct. 2733, 2757, 57 L.Ed.2d 750 (1978)).[11]
To be clear, there are certain things the Court does not do in this Order:
(1) This Order will not apply to any applicants for probationary firefighter other than the plaintiffs;
(2) This Order does not indicate that this Court will award any monetary damages[12];
*1025 (3) This Order will not serve as precedent or as a basis for claims by other applicants for the position of probationary firefighter.
This Court will affirm and approve of the validity of the current testing procedure adopted by the City. Furthermore, no party has filed any objection to such test, as it meets the validation requirements required both by the consent decree and by the Court's prior Orders. See Doc. 103.
This Court will ORDER that the SMSA shall serve as the relevant geographic area for hiring probationary firefighters, effective sometime in 1998. Consequently, the Court finds that racial parity was reached at that time.
Accepting this Order as the law in this case, counsel for the parties shall meet together and, insofar as possible, agree to the wording of their answers to the following:
(1) When plaintiffs Deeken and Martinez should have been hired as probationary firefighters;
(2) What other relief, if any, plaintiffs Deeken and Martinez should receive;
(3) Prepare a proposed Order in accordance with the findings contained in this Memorandum, including the instatement of plaintiffs Deeken and Martinez as probationary firefighters.
Such answer shall be filed within 15 days of the date of this Order.
The City of St. Louis's motion for summary judgment (Doc. 128) is DENIED IN PART, and plaintiff Deeken's motion for summary judgment, joined by plaintiff Martinez, as to the City's liability (Doc. 130) is GRANTED IN PART.
So ORDERED.
NOTES
[1] E.D. Mo. Case Nos. CV 74-30C(1) and CV 74-200C(1).
[2] A "Standard Metropolitan Statistical Area" is "a statistical concept developed and used by the United States Bureau of the Census. SMSA represents a large, economically-integrated, metropolitan area which includes a city of a specified population, the county in which the city is located and contiguous counties, if such counties are metropolitan and economically integrated to the city." White & White, Inc. v. Amer. Hosp. Supply Corp., 540 F.Supp. 951 (W.D.Mich.1982), rev'd on other grounds, 723 F.2d 495 (6th Cir. 1983).
[3] The City asserts that 1,148 of the addresses include the designation "St. Louis, Mo." and claims that the numbers set forth by Deeken cannot be verified. (Doc. 152 pt. 1 at p. 18)
[4] In April 2001, having passed the written and physical components of the 2001 testing process with a composite score of 94.68 (the highest composite score of all candidates in the 2001 testing process), Deeken was ranked at the top of the "open list" for appointment as probationary fire private. The City hired no candidates from the 2001 "open list."
[5] The United States, perhaps because of its experience in handling similar cases across the country, was ahead of the other parties and this Court in anticipating the demographic change discussed herein.
[6] Upon the Court's request of March 20, 2003 (Doc. 79), the parties briefed the issue. (Docs. 82-87).
[7] The Court notes that other Courts of Appeals have adopted larger metropolitan areas as the appropriate relevant labor pool. See, e.g., EEOC v. Olson's Dairy Queens, Inc., 989 F.2d 165, 168-69 (5th Cir.1993) (using applicant flow to determine a larger relevant labor market than that contemplated by the District Court, noting that "[i]n order to test for discriminatory hiring, [a] court evaluates employers' work force in terms of available labor pool, not the other way around."); see also Bennett v. Roberts, 295 F.3d 687, 697 (7th Cir.2002) (suggesting that an expert should have considered the Chicago Primary Metropolitan Statistical Area in statistical analysis, noting that "[i]n defining the proper labor market, the expert must identify not only those individuals who are qualified for the position but also those who are potentially interested in it.")
[8] In 1875, St. Louis had an opportunity to merge with St. Louis County. Its voters refused and left the city with no practical way to ever expand its borders.
[9] The westward expansion of the City of St. Louis and even St. Louis County is so apparent that a Court might even take judicial notice of this pattern.
[10] Another Court has noted that "experience teaches us that on some occasions public employers prefer the supervision of a federal court to confronting directly its employees and the public." U.S. v. City of Miami, 2 F.3d 1497, 1507 (11th Cir.1993). The Court today recalls the very real racial tension that preceded the entry of the initial Consent Decree.
[11] See, e.g., In re Pearson, 990 F.2d 653, 658 (1st Cir.1993) (discussing a district court's authority to modify a consent decree sua sponte, finding that "notwithstanding the parties' silence or inertia, the district court is not doomed to some Sisyphean fate, bound forever to enforce and interpret a preexisting decree without occasionally pausing to question whether changing circumstances have rendered the decree unnecessary, outmoded, or even harmful to the public interest."); see also 7 Emp. Coord. Employment Practices §§ 22:9 & 69:47 (outlining factors to be considered by district courts when deciding whether to terminate supervision or jurisdiction over consent decrees).
[12] The Court notes that no party has brought evidence to the Court that an employer must be held liable for monetary damages merely for enforcing a valid consent decree. The case presented to the Court from the Fifth Circuit Court of Appeals involved a city that implemented racial preferences beyond those required by the consent decree and is thus inapplicable to the case at bar. See Police Ass'n of New Orleans v. City of New Orleans, 100 F.3d 1159 (5th Cir.1996).